18 Cal.Rptr.3d 15 (2004)
121 Cal.App.4th 909
In re JACOB E., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Anna O., Defendant and Appellant.
Los Angeles County Department of Children and Family Services, Plaintiff and Appellant,
v.
Vicky G., Defendant and Respondent.
No. B167953.
Court of Appeal, Second District, Division Three.
July 29, 2004.
As Modified August 18, 2004.
Rehearing Denied September 1, 2004.
Review Denied November 10, 2004.
*17 Sharon S. Rollo, Chatsworth, under appointment by the Court of Appeal, for Defendant and Appellant, Anna O.
Lloyd W. Pellman, County Counsel and Judith A. Luby, for Plaintiff and Respondent and for Plaintiff and Appellant Los Angeles County Department of Children and Family Services.
Mark A. Massey, Monterey Park, under appointment by the Court of Appeal, for Defendant and Respondent Vicky G.
Craig E. Arthur, under appointment by the Court of Appeal, for Minor Jacob E.
*16 CROSKEY, J.
This juvenile dependency case involves two appeals. Anna O. (Anna), the maternal grandmother of Jacob E. (Jacob), appeals from two juvenile court orders. She challenges the juvenile court's order denying her application for de facto parent status on the grounds that the juvenile court improperly applied the relevant criteria by failing to take into account the lengthy period of time that she cared for Jacob in the role of his parent. Anna also contends that the juvenile court abused its discretion by failing to hold a hearing before the Department of Children and Family Services (the Department) removed Jacob from her care. Finding no abuse of discretion, we affirm the juvenile court's orders.
The Department appeals the juvenile court's order appointing counsel for Jacob's birth mother (mother) at the hearing on Anna's application for de facto parent status. The Department contends that because mother's parental rights had been terminated more than two and one-half years before the hearing, there was no statutory basis upon which to appoint counsel. We agree. Welfare and Institutions *18 Code section 317[1] provides for the appointment of counsel to a parent or guardian. Mother's parental rights had been terminated and she was not entitled to appointed counsel in the juvenile court or on appeal. Moreover, because mother's rights had been terminated, the juvenile court's order granting mother visitation is void. We therefore reverse the orders appointing counsel and granting mother visitation.

FACTUAL AND PROCEDURAL BACKGROUND

1. Jacob's Initial Detention

In July 1998, pursuant to a petition the Department filed, Jacob, then 17 months old, and his brother Richard, then three-years-old, were declared dependents of the juvenile court based on allegations that their mother had been using methamphetamines around them (§ 300, subd. (b) [inability of parent to supervise, protect, or care for child]), and their father's whereabouts was unknown (§ 300, subd. (g) [failure to provide necessities]). Jacob and Richard had previously been ordered detained with Anna, their maternal grandmother.
At the dispositional hearing on September 1, 1998, the juvenile court ordered the children to remain with Anna and ordered reunification services for mother and father. Mother did not avail herself of the services offered, and the court terminated her reunification services on June 7, 1999. Although father had since been located and attempted to participate in the reunification services provided, his family reunification services were eventually terminated on March 2, 2000. The court then set the matter for a section 366.26 permanent placement plan hearing.

2. Parental Rights Terminated and Anna Expresses Interest in Adoption

At the section 366.26 hearing on June 29, 2000, the Department recommended terminating parental rights based on the parents' noncompliance with the case plan and identified adoption as the permanent placement plan. According to the Department, Anna had indicated as early as April 1999 that she wanted to adopt the children. The hearing, however, was continued to permit the Department to determine whether Anna wanted instead to become the children's legal guardian. After the Department presented the option of legal guardianship to Anna, she again expressed her desire to adopt the children and signed an affidavit to that effect.[2]
On September 19, 2000, the court terminated parental rights. The court ordered the Department to provide permanent placement services under the plan of adoption and to proceed with adoptive planning for both Jacob and Richard. Although Anna expressed her desire to adopt the children, she would never complete the necessary steps to do so.

3. Jacob's Placement with Anna

During the first three years that Anna cared for Jacob and Richard, by all accounts she received glowing reports. Richard suffers from cerebral palsy and mental retardation, and he is fed through a gastronomy tube. Jacob has no health problems. According to the Department's reports, both children appeared to be happy *19 and well taken care of in Anna's home. That all changed in the summer of 2001 when Richard was removed from Anna's care.
On August 24, 2001, the Department informed the court that it had removed Richard from Anna's care because of medical neglect. According to the Department report, Richard, now six-years-old, had lost two pounds, and weighed just 18 pounds. His weight loss appeared to be caused by a side effect to new medication that made him vomit. Anna let the condition persist for five weeks without notifying Richard's doctor. Richard also had missed medical appointments and had missed 120 days of a total of 180 days of a special preschool that he attended.
Richard was hospitalized on August 9, 2001, and never returned to Anna's care. After he was released from the hospital, Richard was placed in a medical care facility. Anna visited him there once. Richard was then transferred to a different medical facility. Anna made no attempt to visit him, or to arrange for Jacob to visit him even after the juvenile court indicated that she was required to do so. Anna also did not obtain the required additional medical training to care for Richard so that he could return to her home.
Following Richard's removal, Anna was angry and became uncooperative with the Department. Anna refused family preservation services. She also denied the Department access to Jacob, and in August 2001 locked herself and Jacob in a room to avoid the caseworker.
The Department became concerned about Anna's inability to follow through with Jacob's care. The Department's December 2001 report states: "[Anna] is somewhat unorganized and does not follow through well. However, if she is reminded several times, she eventually follows through on whatever she [has] committed to do. She was out of compliance with regard to Jacob's yearly medical and dental. She stated to CSW that she would take Jacob for a medical and dental exam in September 2001. She only recently took Jacob for a yearly medical exam (on 11/28/01). In addition, [Anna] agreed to enroll Jacob in a pre-school program several months ago. When CSW talked with her about whether she had enrolled Jacob, she replied, `"E" [sic] not school age yet and you can't make me enroll him in school.'"
In March 2002, a new social worker was assigned to the case. Anna continued to be uncooperative and resisted the Department's involvement in Jacob's care. Moreover, Anna did not enroll Jacob in preschool. In April, she told the caseworker that she was in the process of enrolling Jacob in kindergarten.
In September 2002, the caseworker raised concerns about Jacob's care. Jacob had not seen a dentist, and Anna had not scheduled his annual medical exam. In addition, although Anna told the caseworker that she had enrolled Jacob in school, the caseworker called the school and learned that Jacob was not enrolled there. At a progress hearing that same month, Jacob's attorney represented that she had spoken to Anna, and Anna had taken Jacob to the dentist. She explained that Anna had delayed the visit because she did not have Jacob's Medi-Cal card. Jacob's attorney also represented that Anna had enrolled Jacob in school. The attorney explained that apparently the caseworker had called the school the day before Anna had delivered the paperwork to the school. Anna, however, had neither taken Jacob to the dentist nor enrolled him in school.
While Anna continued to express an interest in adopting Jacob and Richard, she had not completed the documents so that *20 the Department could conduct a home study, nor had she completed the necessary medical training and repairs to her home so that she could adopt Richard. With respect to the documents, Anna claimed that she had completed them and the Department had lost them. She expressed frustration that she had to complete the forms a second time. The juvenile court, however, asked her to complete the documents again, but she never did so.
By March 2003, Jacob, now six-years-old, was still not enrolled in school. The Department had also confirmed that Jacob had not seen a dentist nor seen his doctor since November 2001. At a progress hearing the following month, Jacob's attorney again reported that she had spoken with Anna and told the juvenile court that Anna would take Jacob to the dentist and doctor that week, enroll him in school the following week, and take him to visit Richard.
Two months later, Jacob still had not been enrolled in school. He also had not been taken for his annual medical exam nor had he seen the dentist. At a progress hearing, Jacob's attorney expressed her frustration with Anna's lack of cooperation: "I spent an extensive amount of time speaking with [Anna]; and, I guess, probably what concerns me the most in seeing Jacob is  he doesn't seem sick  not seeing the doctor and dentist concerns me, but the school issue  my client is six and he has never been enrolled in school. He has a stutter and he's just getting further and further behind. I don't think that  I just don't know if the caretaker is capable of meeting his needs, meeting his basic needs."
Although the Department was willing to give Anna an additional 30 days, Jacob's attorney stated that she believed the Department should detain Jacob. The court responded after further discussion, "I think he is going to have to be detained," and Jacob's attorney agreed. At the conclusion of the hearing, the Department and the court discussed whether or not the Department would file a petition regarding a change in Jacob's placement. Jacob's attorney pointed out that the Department did not have to file a petition to change Jacob's placement. The juvenile court then ordered a two-week progress report for May 19, 2003, for a "[s]upplemental on department re-placing Jacob and his enrollment in school in the new placement."[3] Anna was not present at this hearing.
The next day, the Department removed Jacob from Anna's care. When Jacob was removed from Anna's care, he told the Department that his "`grandma hits him with a stick in his hand when he is bad and that makes him sad.'" In addition, according to the Department, Jacob disclosed "`my grandma and my grandpa fight and hit each other [and] I ask them to stop and they keep fighting . . . that makes me sad too.'"

4. Anna Files De Facto Parent Application

On May 19, 2003, Anna applied to become Jacob's de facto parent. She asserted *21 that she had provided Jacob with a loving home for five years, and met his daily needs, including his medical and dental needs. She further contended that she did not get along with the caseworker and blamed her for the delay in the adoption process. In addition, she attached documents to the petition that included: (1) a "report of health examination for school entry," showing that Jacob had seen a doctor in April 2003; (2) an appointment card scheduling a dental appointment for Jacob on May 12, 2003; and (3) Jacob's immunization card. Anna also submitted documents that she was enrolled in the foster and kinship care education class, and had enrolled in special medical classes to take care of Richard. Finally, she asserted that her parents were of Native American heritage.
The Department opposed Anna's de facto parent application. It argued that it had been trying to work with Anna since March 15, 2002, and that she had been uncooperative and "extremely resistant."
At the de facto parent status hearing, Jacob's mother, whose parental rights had been terminated in September 2000, also was present and requested court-appointed counsel. The Department objected to the appointment and argued that there was no statutory basis for appointment of counsel. Over the Department's objection, the court appointed counsel.[4]
The juvenile court denied Anna's de facto parent application. Anna timely appealed. In addition to challenging the denial of her de facto parent application, she challenges the failure of the Department to investigate Indian Child Welfare Act (ICWA),[5] and the denial of a hearing before Jacob was removed from her care.

CONTENTIONS
Anna raises two errors in her appeal. She contends that the juvenile court abused its discretion in denying her de facto parent status by improperly applying the relevant criteria and, more specifically, by failing to recognize the lengthy period of time that she cared for Jacob. Anna further contends that the juvenile court abused its discretion by ordering that Jacob be removed from her care without affording her a right to a hearing on the removal issue.
The Department appeals the juvenile court's orders following termination of mother's rights that include appointing counsel for mother and granting mother visitation. It contends that the juvenile court had no statutory authority for either order because mother's parental rights had been terminated.

DISCUSSION

1. The Juvenile Court Did Not Abuse its Discretion in Denying Anna's De Facto Parent Application

a. Standard of Review

A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of *22 parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period. . . ." (Cal. Rules of Court, rule 1401(a)(8); In re Leticia S. (2001) 92 Cal.App.4th 378, 381, 111 Cal.Rptr.2d 810.) The denial of a petition for de facto parent status is reviewed for abuse of discretion. (In re Leticia S., supra, at p. 381, 111 Cal.Rptr.2d 810.) "In most cases, the lower court does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status." (In re Michael R. (1998) 67 Cal.App.4th 150, 156, 78 Cal.Rptr.2d 842, citing In re Krystle D. (1994) 30 Cal.App.4th 1778, 1809, 37 Cal.Rptr.2d 132.)

b. While Jacob Was in Her Care, Anna Failed to Adequately Perform the Role of a Parent

The decision to grant de facto parent status turns on the facts of each case. Although the Supreme Court has not set forth specific guidelines for a juvenile court to apply in determining de facto parent status, courts have generally considered such factors as whether "(1) the child is `psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact between the adult and the child. [Citations.]" (In re Patricia L. (1992) 9 Cal.App.4th 61, 66-67, 11 Cal.Rptr.2d 631.)
Recognizing that a court can only benefit from having all relevant information on the best interests of the child, appellate courts also have observed that de facto parent status ordinarily should be liberally granted. (In re Patricia L., supra, 9 Cal.App.4th at p. 67, 11 Cal.Rptr.2d 631.) "If the information presented by the de facto parent is not helpful, the court need not give it much weight in the decisionmaking process. . . . [Citation.]" (Ibid.)
The party seeking de facto parent status has the burden of proving, by a preponderance of the evidence, that he or she falls within the statutory definition. (See In re Michael R., supra, 67 Cal.App.4th at p. 156, 78 Cal.Rptr.2d 842.) Having reviewed the record, we conclude that based on the factors stated above, Anna did not meet her burden, and thus, the trial court did not abuse its discretion in denying Anna de facto parent status.
While Jacob lived with Anna for a long period of time, she did not show that she adequately assumed the role of parent on a day-to-day basis, fulfilling his physical and psychological needs. Rather, though the record shows that Jacob and Anna had a close and loving relationship, it also shows that Anna neglected parental responsibilities, chief among them her failure to enroll Jacob in kindergarten, to schedule medical and dental appointments, and to ensure that Jacob maintain a relationship with his disabled older brother. After repeated attempts to get Anna to comply with juvenile court orders and work with the Department, the Department and Jacob's attorney concluded it had no option but to find a more suitable placement for Jacob. After Jacob was removed from Anna's care, he revealed she would hit him with a stick, and that he had witnessed domestic violence. Under these circumstances, Anna acted contrary to the role of a parent. Thus, the juvenile court's denial of the special status of de facto parent to Anna was not arbitrary, capricious, or a patently absurd determination.
*23 Citing In re Vincent C. (1997) 53 Cal.App.4th 1347, 62 Cal.Rptr.2d 224, Anna argues that since she did not harm or abuse Jacob, and had cared for Jacob for an extended period of time, there was no good reason to deny her de facto parent status. In Re Vincent C. concluded that the removal of the grandchildren from the paternal grandmother's care, and the paternal grandmother's admission that she was unable to care for her grandchildren, were insufficient reasons to deny de facto parent status. (Id. at pp. 1356-1357, 62 Cal.Rptr.2d 224.) In reaching this conclusion, the court noted that absent physical or sexual abuse, there ought to be a "very good reason" for denying de facto parent status to a grandparent or other close relative who has cared for a dependent child for an extended period of time. (Id. at p. 1358, 62 Cal.Rptr.2d 224.)
While Anna did not sexually abuse Jacob, the record shows that the juvenile court had good reasons to deny de facto parent status to Anna. Anna's situation is not analogous to the grandmother in In re Vincent C. Anna denied that she needed help in caring for Jacob, resented the Department's repeated attempts to help her with Jacob, and misrepresented to Jacob's attorney and the juvenile court that she had complied with parental responsibilities of ensuring that Jacob had routine medical and dental examinations and was enrolled in school. While Anna cared for Jacob for five years, the extended period of time that she cared for him is not determinative. The record shows that during the latter part of that period Anna no longer cooperated with the Department and her recent care of Jacob was inadequate and fundamentally at odds with the role of a parent. We therefore affirm the juvenile court's order denying Anna de facto parent status.[6]

2. Anna was not Entitled to a Hearing Before Jacob's Removal Because She was not a Prospective Adoptive Parent

Anna also challenges the juvenile court's order that the Department find another suitable placement for Jacob. Citing C.V.C. v. Superior Court (1973) 29 Cal.App.3d 909, 106 Cal.Rptr. 123, Anna contends that because she was a prospective adoptive parent she was entitled to notice and a hearing before Jacob was removed from her care. This argument misrepresents Anna's status as a prospective adoptive parent and therefore ignores the statutes and case authority governing the juvenile court's review of the Department's placement decisions. The Legislature has given the Department exclusive custody and control of this issue subject only to review as to whether the Department abused its discretion in placing the minor or in its determination that the placement, once made, remains appropriate.
When a dependent of the juvenile court has been freed from the custody and control of his parents and referred to the Department for adoptive placement, section 366.26, subdivision (j), gives the Department broad power to make placement decisions pending adoption. The statute provides in pertinent part: "The State Department of Social Services or licensed adoption agency shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a *24 petition for adoption is granted." (§ 366.26, subd. (j), italics added.)
Family Code section 8704, subdivision (a), is in accord, providing: "The department or licensed adoption agency to which a child has been freed for adoption by either relinquishment or termination of parental rights is responsible for the care of the child, and is entitled to the exclusive custody and control of the child until an order of adoption is granted. Any placement for temporary care, or for adoption, made by the department or a licensed adoption agency may be terminated in its discretion at any time before the granting of an order of adoption. In the event of termination of any placement for temporary care or for adoption, the child shall be returned promptly to the physical custody of the department or licensed adoption agency."
In Department of Social Services v. Superior Court (1997) 58 Cal.App.4th 721, 68 Cal.Rptr.2d 239, the court concluded that the clear language of section 366.26, subdivision (j), and Family Code section 8704, subdivision (a), demonstrated that the Legislature granted the Department the exclusive custody, control, and supervision of a child referred for adoptive placement. (Id. at p. 733, 68 Cal.Rptr.2d 239.) In that case, the juvenile court directed the Department of Social Services (DSS) to place two children with a particular foster family with their other siblings, despite DSS's decision to place the children with a different family pending adoption. In making its order, the juvenile court relied on its authority under section 366.3, subdivisions (a), (d), and (e), to determine the appropriateness of the placement. (Id. at pp. 730-731, 68 Cal.Rptr.2d 239.) The Court of Appeal reversed.
Before addressing the discretion afforded the juvenile court to determine the appropriateness of the placement, the appellate court construed the language of section 366.26, subdivision (j), and Family Code section 8704, subdivision (a). It concluded that those code sections granted DSS the exclusive custody, control, and supervision of a child referred for adoptive placement. (Department of Social Services v. Superior Court, supra, 58 Cal.App.4th at p. 733, 68 Cal.Rptr.2d 239.) "This exclusive authority expressly includes decisions on adoptive placement as well as temporary care, i.e. foster care placement pending adoptive placement. Moreover, the Legislature explicitly has provided that, prior to the filing of a petition for adoption, the agency may change an adoptive placement at its discretion. [Citation.]" (Ibid.)
The court further noted, however, that DSS's discretion is not unfettered. Under section 366.3, the juvenile court may review the "appropriateness of the placement." This review indicates a legislative assessment that the DSS, or in this case, the Department, might on occasion abuse its discretion. The court cautioned, however, that judicial review "does not mean the juvenile court may substitute its judgment for [the Department] as this would interfere with [the Department's] exclusive custody and control of the minor and [the Department's] discretion in making adoptive or temporary care placements. Read together, the statutes clearly reflect a legislative intent that the juvenile court is limited to reviewing whether [the Department] abused its discretion in placing the minor . . . ." (Department of Social Services v. Superior Court, supra, 58 Cal.App.4th at p. 734, 68 Cal.Rptr.2d 239.)
Based on this statutory scheme, the Department had discretion to remove Jacob from his placement. Anna was not entitled to a hearing before Jacob was removed from her home because she had not been identified as a prospective adoptive *25 parent. Although Anna had expressed an interest in adopting Jacob, Anna did not fill out the necessary documents and was unwilling to have the Department complete a home study to begin the adoption process. Indeed, the record reveals that the Department contacted Anna six times between March and April 2003 to arrange a home assessment. Anna, however, would not cooperate. Thus, the Department never began the adoption process to identify Anna as a prospective adoptive parent.
The cases cited by Anna to support her argument that she was entitled to a hearing are unpersuasive. C.V.C. v. Superior Court, supra, 29 Cal.App.3d at pages 916, 918-920, 106 Cal.Rptr. 123, involved prospective adoptive parents. In that case, the court concluded that former Civil Code section 224n, a predecessor of Family Code section 8704, afforded prospective adoptive parents the right to an evidentiary hearing following the agency's determination to remove an 18-month old baby girl placed with them for adoption. Adoption of Baby Girl B. (1999) 74 Cal.App.4th 43, 50-55, 87 Cal.Rptr.2d 569, involved a different statutory scheme, that is, the adoption statutes, and the denial of an evidentiary hearing on a petition for adoption. In re James Q. (2000) 81 Cal.App.4th 255, 265, 96 Cal.Rptr.2d 595, involved the right to a contested hearing under section 366.21, subdivision (e).
Finally, although Anna never challenged the Department's decision to remove Jacob in a juvenile court proceeding, she does so on appeal. Putting aside any procedural concerns with raising this argument for the first time on appeal, we find ample support in the record that the Department did not abuse its discretion in removing Jacob from Anna's care. During the last year of Jacob's placement with Anna, it became obvious to the Department and Jacob's attorney that Anna could not meet Jacob's basic needs. Anna remained resistant, uncooperative, and misrepresented to Jacob's attorney and the juvenile court that she had complied with the case plan when she had not done so. Although Anna points to the evidence presented in support of her application for de facto parent status to show that the Department acted arbitrarily in removing Jacob from her home, none of that evidence shows that Anna was meeting Jacob's current needs or following through with his care. Moreover, while Jacob and Anna may have a loving relationship, there is nothing in the record to show that Anna was willing to work with the Department or willing to take the necessary steps to adopt him. The Department gave Anna numerous opportunities; it did not act arbitrarily or capriciously when it removed Jacob from Anna's care. The order to find another suitable placement for Jacob is affirmed.

3. The Juvenile Court Erred when it Appointed Counsel for Mother

The Department contends that there was no statutory basis for the juvenile court to appoint counsel for mother. We agree.
As the parties acknowledge, the central statute that controls the appointment of counsel is section 317. That section provides in pertinent part: "(a) When it appears to the court that a parent or guardian of the child desires counsel but is presently financially unable to afford and cannot for that reason employ counsel, the court may appoint counsel as provided in this section. [¶] (b) When it appears to the court that a parent or guardian of the child is presently financially unable to afford and cannot for that reason employ counsel, and the child has been placed in out-of-home care, or the petitioning agency is *26 recommending that the child be placed in out-of-home care, the court shall appoint counsel, unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section."
California Rules of Court, rule 1410 et seq. concern the conduct of juvenile proceedings in general. Rule 1412 (e) and (f) deal with the right of de facto parents and relatives to participate in the proceedings, with the court having discretion under subdivision (e) to appoint counsel for a de facto parent. Rule 1412 (g) and (h) provide for the appointment of counsel, but, like section 317, limit the appointment of counsel to a parent or guardian. Thus, the Rules of Court and section 317 provide for appointed counsel for a financially indigent parent and guardian, and for discretionary appointment of counsel for a de facto parent.
Mother had no legal status to obtain appointed counsel. Mother's parental rights terminated on September 19, 2000. At the time of the de facto parent hearing in June 2003, mother was not a parent, guardian, or de facto parent, and she was not entitled to appointed counsel. The juvenile court had no statutory authority to appoint counsel.[7]
Mother concedes there is no statutory authority to appoint counsel. Instead, she relies on cases in which the court exercised its inherent powers, independent of a statute, as a basis for the orderly administration of justice. These cases are inapposite. Superior Court v. County of Mendocino (1996) 13 Cal.4th 45, 51 Cal.Rptr.2d 837, 913 P.2d 1046, addressed the separation of powers and the validity of legislative actions relating to the judicial branch and concluded that the Legislature does not necessarily violate the separation of powers doctrine even by legislating with regard to "inherent judicial powers or functions of the court." (Id. at pp. 58-59, 65, 51 Cal.Rptr.2d 837, 913 P.2d 1046.) Asbestos Claims Facility v. Berry & Berry (1990) 219 Cal.App.3d 9, 19, 23-25, 267 Cal.Rptr. 896, and Cottle v. Superior Court (1992) 3 Cal.App.4th 1367, 1376-1378, 5 Cal.Rptr.2d 882, are complex litigation cases and involve the exercise of inherent power under Code of Civil Procedure section 187,[8] which confers upon the court the power to establish means to control litigation when no statute or code section controls the process. Here, the Welfare and Institutions Code and the Rules of Court specifically state the procedure upon which the juvenile court can appoint counsel, thus there was no need to establish other means through the exercise of the court's inherent power. The juvenile court erred in appointing counsel for mother.

4. The Juvenile Court Erred in Granting Mother Visitation of Jacob

The Department contends that the juvenile court's order granting mother visitation is an impermissible collateral attack on the order terminating her parental rights. We agree and conclude that the order providing mother with visits was a *27 modification of the order terminating parental rights and such order is void.
Section 366.26, subdivision (i) provides in pertinent part: "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents. . . . After making the order, the court shall have no power to set aside, change, or modify it, but nothing in this section shall be construed to limit the right to appeal the order." Mother did not appeal the order terminating parental rights.
Having failed to appeal the termination order, mother's attempt to obtain visitation with Jacob was in substance a collateral attack on the termination of her parental rights. She was asking the court to reinstate her as a parent, and do what it no longer had jurisdiction to do, that is, undo the termination of her parental rights so that she could visit Jacob. Subdivision (i) of section 366.26 specifically states that once the termination order issues, the court has "no power" to "modify it." (Cf. In re Ronald V. (1993) 13 Cal.App.4th 1803, 1805-1806, 17 Cal.Rptr.2d 334.) The juvenile court had no jurisdiction to make the visitation order.

DISPOSITION
The May 19, 2003, and June 11, 2003, order denying de facto parent status is affirmed. The May 5, 2003, order to remove Jacob from Anna's care and to find him suitable placement is affirmed. The June 11, 2003, order appointing mother counsel is reversed. The June 23, 2003, order granting mother visitation with Jacob is void and of no legal effect.
We Concur: KLEIN, P.J., and KITCHING, J.
NOTES
[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.
[2] The affidavit states: "I am the maternal Grandmother of Richard & Jacob . . . . I would like to inform the court that I want to pursue . . . adoption of the children."
[3] The court's minute order dated May 5, 2003, does not indicate that it ordered Jacob removed from Anna's care. It ordered a progress report due on May 19, 2003, "to address department replacing Jacob and his enrollment in school in new placement." Neither Anna's notice of appeal nor her opening brief refers to any juvenile court order that the Department remove Jacob from Anna's care and find him another suitable placement. The notice simply states " minor removed without hearing " and cites the hearings on May 19, 2003, and June 11, 2003, in which Anna moved for de facto parent status after Jacob had been removed from her care. Nevertheless, we construe the notice liberally and read the May 5, 2003, hearing transcript and minute order as the juvenile court order to find another suitable placement for Jacob.
[4] The juvenile court appeared to believe that the appointment was in the best interest of the children because the children were not adoptable and the time deadlines before terminating parental rights were too short for someone like the mother who apparently had a drug problem. The juvenile court, however, recognized that there was no statutory basis under section 317 for the appointment of counsel. It stated: "[T]he court always has the discretion to appoint counsel where it is of assistance to the court and that is what I've done here."
[5] On June 23, 2003, the court ordered an ICWA inquiry. Thus, this issue is not raised in Anna's opening brief and we deem the issue waived.
[6] Although mother attempts to challenge the juvenile court's order denying Anna's de facto parent status, she lacks standing to do so. Mother's interests have not been prejudiced by the denial of de facto status to Anna. (In re Daniel D. (1994) 24 Cal.App.4th 1823, 1835, 30 Cal.Rptr.2d 245.)
[7] The Department also appears to challenge Anna's right to counsel and court-appointed counsel on appeal. We do not address this issue because the Department's notice of appeal does not challenge the proceedings appointing Anna's counsel.
[8] Code of Civil Procedure section 187 provides: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."