Filed 9/3/13  In re Ruben C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re RUBEN C. at al., Persons Coming Under the Juvenile Court Law. | B245932 (Los Angeles County Super. Ct. No. CK59723) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. VERNA C., Defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Amy M. Pellman, Judge.  Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

Verna C. appeals from a juvenile court order denying her request for de facto parent status and rejecting her attempt to compel the return of two foster children to her care. We find no abuse of discretion and affirm.

## FACTS

Ruben C. (born in 2004) and Brandon M. (born in 2006) were detained by the Department of Children and Family Services (DCFS) in July 2010, along with two sisters ages one and eight months. The children's 22-year-old mother Daisy C. (Mother) was pregnant with her fifth child. The father of the three younger children, Andy M., was arrested on outstanding warrants, after the police found drug paraphernalia in the family's motel room. He disclosed a criminal history dating to age 11. Mother admitted to using methamphetamine and cocaine during her current pregnancy.

In an interview, Connie H.—who is either a relative or a close family friend— stated that Mother previously lived with her to have a stable home for Ruben when he was a baby.[1] Two years later, Mother became pregnant with Brandon, despite Ms. H.'s efforts to encourage Mother to complete her schooling. Mother moved out of Ms. H.'s home. Since then, Mother has been "bouncing around" and repeatedly getting pregnant. Ruben is six years old, but Mother never enrolled him in school. Ms. H. described the children as "out of control" when they are with Mother. Ms. H. had Brandon in her home on weekends, and they became very attached. She tried to teach Ruben some boundaries. Ms. H. indicated that Mother admitted using drugs while pregnant. Ms. H. urged Mother to enter a drug rehabilitation program, but Mother insisted that she could overcome drugs on her own.

Ms. H. noted that the parents set no boundaries for the children. Ruben, Brandon and their eight-month-old sister "were observed to have bite marks on their body, presumably due to aggressive behaviors among the children," and Ruben has facial scars

---

[1]    Ms. H. told the court "I am an extended relative, aunt." Ruben was made a dependent of the juvenile court in 2005, when Mother was shot while associating with known gang members and made no provisions for his care and supervision.

from Brandon's scratches. The children choke each other. DCFS believed that the children are developmentally delayed or neglected: Ruben does not speak in full sentences and has a limited vocabulary; his 22-month-old sister does not speak full words; and the baby has "gross motor delay," suggesting the possibility of pre-birth exposure to drugs or alcohol.

All four children were initially placed with a maternal great-great aunt A few weeks later, she informed DCFS that she was unable to provide a home for four children. Ruben and Brandon were placed in foster care. In an assessment report, DCFS noted that Ruben and Brandon "appear to have established bonds with close family friend, Connie [H.], who Ruben refers to as his aunt and who Brandon refers to as Nana." Ms. H. maintains regular contact with the boys by telephone, expressed interest in visiting them, and wished to care for them if Mother failed to reunify. In September 2010, Mother gave birth to a son, who was removed from her at the hospital and placed in foster care. She admitted using drugs a few days before giving birth.

On October 25, 2010, the juvenile court sustained allegations that the parents have a history of substance abuse and currently abuse methamphetamine. The parents' drug use renders them incapable of providing regular child care and supervision, and poses a risk to the children's physical and emotional health. The court ordered DCFS to assess whether Ruben could be placed with appellant Verna C., the mother of Ruben's *alleged* father, Victor C. Victor C. has been incarcerated since 2004, has never had face-to-face contact with Ruben, and does not provide his son with the necessities of life. Appellant expressed an interest in having Ruben placed with her. Apart from her possible tie to Ruben, appellant is not related to the other children involved in the proceeding.

In a pre-release investigative report, DCFS stated that because appellant's adopted son Victor is an alleged father only and will be incarcerated for 20 years, he was not offered reunification services. Appellant has a lengthy history with DCFS: from 1998 to 2006, there were nine substantiated referrals against her for general and severe neglect involving four children, including Victor C., as well as one inconclusive referral. Appellant received family reunification services. She was detained by police for child

3

cruelty. Two adult children currently live with her. Her home was adequately sized, though the living/dining room was filled with boxes, clothing and other items. Appellant intended to convert it into a bedroom for Ruben. Ruben told the social worker that he likes Verna C. but does not really know her. He could not recall the last time he saw her. Ruben was silent when asked if would like to live with appellant, but emphatically agreed that he wished to continue living with his brother Brandon. Mother indicated that she did not want the two boys separated as they support each other. Appellant and her adult daughter Elizabeth were "extremely clear that they cannot take Brandon as well. They are only able to provide a home for Ruben." A four-year-old like Brandon "wouldn't fit into their lifestyle and they absolutely will not and cannot take care of him."

Appellant stated that most of her past problems with DCFS arose from "housekeeping issues." She "has not had much of a significant relationship with Ruben since his birth. She has seen him at a few family functions, but neither she nor her children have had a significant connection or relationship with Ruben. She stated that Ruben recognizes her and he will interact with her when they see each other, but the relationship is limited." Appellant felt able to provide a safe, secure and stable environment for Ruben, is willing to meet all his needs, would comply with court orders and facilitate visitation, and is willing to pursue adoption if reunification fails. DCFS recommended that Ruben remain in foster care due to appellant's criminal and DCFS history, the importance of keeping Ruben and Brandon together, and the limited relationship between appellant and Ruben. In December 2010, the court kept the boys in their current foster home.

In April 2011, DCFS reported that the children were thriving with their caregivers and doing well in school. Appellant informed the court that she is now willing to take care of both Ruben and Brandon, having spent time with them every weekend since January 15. Appellant intended to place the boys in after-school care during her work hours. The court directed DCFS to reassess the appropriateness of appellant's home for Ruben and Brandon.

4

In a May 2011 report, DCFS noted that appellant "has multiple investigations alleging and finding neglect due to having a 'home in disarray, cluttered and inappropriate living conditions.'" The boys answered affirmatively when asked if they would like to live together with appellant. Appellant's daughter Elizabeth "was extremely clear that she is not willing to take responsibility of the boys as she is very concerned about the mental health issues Ruben will have due to the abuse by the parents." Appellant stated that "she and the boys are beginning to develop a relationship." DCFS recommended that the boys remain in their current placement due to concerns about appellant's ability to properly care for two young children (as demonstrated by appellant's history of child neglect referrals) and Elizabeth's unwillingness to care for the children.

In June 2011, appellant informed the court that she was hiring house cleaners, purchasing beds for the boys, and locating schools. Over the objections of DCFS, the court released the boys to appellant. In October 2011, DCFS reported that the five children are thriving in their placements. Mother tested positive for methamphetamine while pregnant with a sixth child. DCFS asked the court to terminate reunification services with a plan of legal guardianship with appellant for Ruben and Brandon, and adoption for the younger children.

In November 2011, DCFS reported that Mother's newborn child Brian was detained at the hospital on November 1, after testing positive for methamphetamine, and placed with Ms. H. DCFS filed a first amended petition for Brian. Andy M. was incarcerated for an assault and battery on Mother. He had completed a drug rehab program, but relapsed when he started associating with Mother. Mother admitted using methamphetamine several times a week during the last two months before giving birth.

Appellant applied to adopt Ruben and Brandon. The court terminated reunification services for the parents on November 29, 2011, set a permanent placement hearing, and identified adoption as the goal for the children.

Appellant was assessed as a prospective adoptive parent for Ruben and Brandon in March 2012. Appellant, a 62-year-old widow with a full-time job, expressed a desire to

5

provide the boys with a permanent, stable and safe home. She views Brandon as her grandson, though she is not related to him. The boys attend an after-school program and she picks them up at 5:00 p.m. The boys enjoy spending time with their newest sibling, Brian. During a visit, the adoption social worker observed that appellant's home is cluttered, and appellant's daughter Elizabeth expressed opposition to the adoption and refuses to undergo an assessment. Appellant described herself as being in good health and feels capable of caring for two young boys. She and her late husband previously adopted three children through DCFS and she understands her legal responsibilities. Ruben and Brandon would like to remain where they are if unable to reunify with their parents, but "they also expressed interest in residing with the prospective adoptive parent/caregiver of their sibling, Brian," Ms. H.

The report describes appellant as "very bonded to the children as they are to her." The boys "have adjusted well and continue to thrive" in appellant's home. Appellant's two biological children are concerned about the adoption because of appellant's age, and they fear that "the boys will take negative routes" as did appellant's adopted son Victor. Appellant dismissed these concerns, pointing to the example of one of her adopted children, who has two college degrees. She feels confident of her ability to provide permanency for the boys.

At a hearing on May 22, 2012, the children's attorney asked the court to direct DCFS to begin a home study for Ruben and Brandon with Ms. H., citing as a "roadblock" to adoption the opposition of appellant's adult children. The attorney for Ruben's alleged father Victor C. opposed removing the children from appellant because "she's doing an excellent job, and there's no reason to consider any other placement." The children's attorney responded that her clients Ruben and Brandon are "torn" because "part of them wants to move [to Ms. H.] with their little brother, Brian." Appellant was unable to say if her adult children would come to accept the boys, and "we need to have a road of permanency here." The court ordered concurrent adoptive home studies for appellant and Ms. H., "and then the court will look to see what would be in the best interest of the children after there is further review."

6

In a status review report for June 2012, DCFS wrote that the boys are still with appellant. Ruben was doing well, but Brandon has behavioral issues and struggles academically. They spend weekends in the home of Ms. H. without incident, and she is willing to provide them with a permanent home. Three social workers agreed that the best interests of the children would be served by placing them in Ms. H.'s home because she "would be able to provide a suitable placement for the children and their growing needs." Appellant expressed affection for Ms. H., who has the ability to care for the children, but felt it would be detrimental to remove the boys from her care as she is providing them with a stable home. Appellant acknowledged the opposition of her adult children, but stated that she would "deal with" them.

The adoption social worker met with appellant and her adult children. Appellant stated that she wished to adopt Ruben and Brandon because they are her grandchildren and she would like to provide them with a permanent home. The social worker spoke privately with appellant's daughter Elizabeth, who stated "that she agreed to live scan under the condition that her mother would buy her a new vehicle. She stated . . . that she 'bribed' her mother" and that they frequently argue. "She does not believe that her home is appropriate for Ruben and Brandon, as a result of the ongoing chaos."

The adoption social worker met with Ms. H., who is 46 years old. She stated that "she loves Ruben and Brandon and considers them to be her own family. The children are extended relatives of her two adult sons." Ms. H. had relocated to a bigger home to prepare for the possible placement of Ruben and Brandon. Ms. H. expressed concern "about ongoing family conflict in [appellant's] home and believes that she is able to provide a more stable, loving and nurturing home environment for the children. Ms. H. also expressed concern about [appellant's] health condition, stress level and lack of social support." The social worker observed that Ms. H. is "extremely attached to the children. She helps to care for them and takes them to her home for the day on a regular basis. Ms. H. is adopting the children's younger sibling, Brian, and wishes for the three siblings to have the opportunity to be raised together. Further, she visits with [the boys' sisters] approximately three times a week and thus, the children would be allowed the

7

opportunity to have a close relationship with their sisters as well." By contrast, appellant "has a difficult time confirming her attendance to the sibling visits and appears unhappy when confirming." Ruben and Brandon like where they are but also expressed interest in residing with Ms. H.

On July 25, 2012, DCFS filed a supplemental petition alleging that appellant "established an endangering and detrimental home environment" for Ruben by allowing Elizabeth "to act in a demeaning manner towards the child's sibling Brandon" thereby placing Ruben at risk of harm. Further, appellant failed to comply with court orders. DCFS moved the children to the home of Ms. H.

In a detention report, the social worker stated that she saw Elizabeth speak to Brandon in a negative way. This provoked an argument between appellant and Elizabeth, and "Brandon got very upset and stormed out of the home. [Appellant] attempted to calm the child down and had very little effect on him." The social worker heard Elizabeth say that "she did not care if the social worker was in the home and that [appellant] was not providing the children with structure and that they did not know how to behave." The social worker was able to calm Brandon, who was still having a tantrum. "Brandon indicated that he was upset and tired of the way that Elizabeth talks to him." Following a meeting between three social workers, DCFS decided to remove Ruben and Brandon because they had concerns that appellant's adult children were having a major impact on appellant, adding stress and affecting her ability to care for Ruben and Brandon. The court found a prima facie case for detaining the boys because a substantial risk exists if they remain in appellant's care.

DCFS noted that Ms. H. has known Mother since childhood and helped care for Mother's children before DCFS became involved. Ms. H. has a good relationship with family members who are fostering the boys' siblings. Ruben and Brandon have a strong bond with Ms. H., like her home, and would like to live with her if unable to reside with appellant. Ms. H.'s adult son supports adoption for all three children. In private, Ruben told the social worker that he loves appellant and will miss her and his school, "but that he was also content with the idea of residing with Ms. H. given that he has a great

8

relationship with Ms. H. and her adult son that resides in the home." Ruben said that he was fine with the social worker's decision to move him to Ms. H.'s home. DCFS also noted that appellant "screams at the boys constantly to the point that the boys are totally tuning her out." Elizabeth also screams and fights with appellant. Elizabeth was angry that the tattoo business she ran from appellant's home was destroyed when the boys were placed there, and appellant's son Donovan is equally unhappy with the presence of the boys. Appellant failed to complete court-ordered classes to learn coping skills.

In August 2012, the social worker met with Ruben and Brandon in their new home. They are happy and comfortable there, and stated that they "would like to live either there or with [appellant]. The children were observed to have a strong bond with Ms. H. and her adult son and vice versa."

In an interview in September 2012, Ruben expressed ambivalence when asked where he wanted to live. He described heated arguments between appellant and Elizabeth, who sometimes shouted at the boys as well. There were fights between Elizabeth and Donovan, using bad words. One time, he saw Donovan smack Brandon on the bottom. In an interview, appellant explained that Elizabeth is "strict" because she does not want the boys to grow up to be gang members like Ruben's father. Appellant admitted that Elizabeth "spoke harshly" to appellant in the presence of a social worker, and caused Brandon to have a tantrum.

Elizabeth denied demeaning the children, and only cusses at appellant and Donovan. Elizabeth believed that the boys would only live in appellant's home for a year, and "is not thrilled" about appellant adopting because appellant cannot give the children everything they need. The boys do not obey appellant or Elizabeth. Elizabeth only agreed to take part in the adoption process so that she could get a car from appellant. Elizabeth plans to move from appellant's home in the very near future. Donovan indicated that appellant raises her voice at the children, but Elizabeth would yell, causing the boys to cry. This was an increasing problem over the last five months. Donovan agreed that Elizabeth spoke in a demeaning way to the children, and cussed at him and appellant. Appellant told Elizabeth to move out if she did not change her behavior.

Donovan stated that he and appellant were upset when the boys were removed because the children were happy and appellant "loves them to death."

Ms. H. observed that appellant relies upon Donovan to discipline Ruben, rather than doing it herself. Elizabeth was never happy about the boys being in appellant's home, giving rise to conflict between Elizabeth, appellant and the boys. Appellant informed Ruben's counselor that the boy is disruptive, argumentative and does not follow rules. He does not listen and acts out when he does not get his way. He has difficulty managing stress and becomes depressed and anxious easily.

After DCFS asked the court to dismiss the petition it filed against appellant, the attorney representing Victor C. demanded that DCFS place the boys back in appellant's care because neither child is at risk. At a hearing in September 2012, after hearing extensive argument, the court found that it did not previously make a specific placement order for Ruben and Brandon because there were concerns about the suitability of appellant's home. As a result of those concerns, visitation began with Ms. H., which went well. The court concluded that since there is only a general placement order, appellant had to file a motion to have the children move back to her home.

On October 22, 2012, appellant sought de facto parent status, asserting that she cared for Ruben on a daily basis and provided for all of his needs.[2] In an addendum, DCFS noted that Ms. H. is willing to adopt Ruben, Brandon and Brian, keeping the siblings in one home. Appellant and Victor C. filed motions to compel DCFS to return Ruben and Brandon to appellant's care.

DCFS opposed appellant's request for de facto parent status, arguing that the bond is stronger for appellant than it is for the two boys. Appellant does not possess information about the children that is unique from other participants in the proceeding, and is only using the de facto parent procedure to try to wrest custody from Ms. H. Mother and Brian's attorney concurred with DCFS that appellant should not receive de

---

[2]     No de facto parent request form for Brandon appears in the record.

facto status because it would delay permanency and Ms. H. is taking appropriate care of Brian, Ruben and Brandon. Appellant contended that she has unique knowledge, especially as to Ruben, relating to his family history.

On November 15, 2012, the court acknowledged a likely psychological bond between appellant and the children. However, the standard is, does appellant have special knowledge or information and would it be in the best interest of the children to have someone at the counsel table to make sure that the special information is shared. The court believed that appellant's request for de facto parent status was a backdoor way to regain custody. Appellant did not seek de facto status before the children were removed. Any special information can be given to DCFS. The boys have been with Ms. H. for nearly five months, without a problem. Nothing appellant said in her request about the children's routines is particularly unique or helpful. The court denied appellant's request for de facto parent status and found that she lacks standing to compel DCFS to transfer custody of the children to her.

## DISCUSSION

Appellant filed two notices of appeal, one from the order denying her de facto parent status, and the other challenging the court's ruling that she has no standing to compel DCFS to act.

### 1. Denial of De Facto Parent Status

A person applying for de facto parent status has the burden of proving the issue. (*In re Hirenia C.* (1993) 18 Cal.App.4th 504, 514.) "[A] finding of de facto parent status is dependent upon the facts of each individual case," with the court examining such factors as the child's psychological bond with the adult; whether the adult "assumed the role of a parent on a day-to-day basis for a substantial period of time"; whether the adult has "unique knowledge about the child"; whether the adult regularly attended hearings; and whether the proceedings will "permanently foreclos[e] future contact between the child and the adult." (*In re Michael R.* (1998) 67 Cal.App.4th 150, 155; *In re Patricia L.* (1992) 9 Cal.App.4th 61, 66-67; Cal. Rules of Court, rule 5.502 (10).) De facto parents

"are among the custodial alternatives the court must appraise, and their views 'deserve consideration.'" (*In re Kieshia E.* (1993) 6 Cal.4th 68, 75.)

In reviewing a motion denying de facto parent status, we apply a deferential abuse of discretion standard. "In most cases, the lower court does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status." (*In re Michael R.*, *supra*, 67 Cal.App.4th at p. 156; *In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.) The court did not abuse its discretion in this case.

Reviewing the entire record, we see that appellant is the mother of Ruben's alleged father, Victor C., who was incarcerated at the time of Ruben's birth and has never had face-to-face contact with Ruben.[3] Appellant has no relation to Brandon, except by virtue of her tie to Ruben. Appellant has a lengthy history with DCFS that includes substantiated referrals for general and severe neglect of four children. Appellant did not maintain life-long close contact with her alleged grandson Ruben: in December 2010, six-year-old Ruben told DCFS that he does not really know appellant and could not recall the last time he saw her. Appellant admitted lacking a significant relationship with Ruben, having seen him a few times at family functions during his lifetime.

Ruben and Brandon wanted to stay together, but appellant was "extremely clear" that she only wanted Ruben, not Brandon. For this reason, along with appellant's DCFS history and minimal relationship with Ruben, the children were not placed with her. It was not until April 2011 that appellant had a change of heart and became willing to care for both Ruben and Brandon, nine months after the boys were detained in foster care. In May 2011, appellant indicated that she and the boys "are beginning to develop a relationship." After appellant stated that she would clean up the detritus in her home and provide beds, the court placed the children with her in June 2011, nearly a year after they were detained. Once placed with appellant, the boys were exposed to a chaotic

---

[3]     An alleged father is a man who may be the father of a child, but whose biological paternity has not been established. (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 715; *In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.)

environment because appellant engages in screaming matches with her resident adult children, and Elizabeth was mean to the boys and made them cry.

By contrast, Ms. H. has been involved in the boys' lives since they were born. Mother and Ruben lived with Ms. H. for two years. Later, Ms. H. had Brandon in her home on weekends and they became very attached. Ms. H. actively tried to discourage Mother's drug use and pregnancies, while urging Mother to complete schooling. The boys refer to Ms. H. as their "aunt" or "nana." She had regular contact with them when they were initially placed in foster care and immediately expressed interest in caring for both of them if Mother failed to reunify.

From this record, we cannot say that appellant met her burden of showing that she is any closer to the boys or that she knows more unique things about them than Ms. H. On the contrary, Ms. H. has spent substantially more time with the boys since birth than appellant. The children are psychologically bonded to both Ms. H. and appellant. Merely having a close and loving relationship is not sufficient grounds for finding de facto parent status when a caretaker fails to fulfill all of a child's needs—including protecting the child from abuse within the caretaker's household. (*In re Jacob E.*, *supra*, 121 Cal.App.4th at pp. 919-921 [despite five years as caretaker, a grandmother failed to merit de facto parent status because she failed to ensure the child's visits with siblings, meet his schooling and medical needs, he witnessed domestic violence and she struck him with a stick, making her home inadequate and another placement more suitable].)

There is no concern that appellant's relationship with the boys will be permanently foreclosed unless she receives de facto parent status. Ms. H. and appellant are on friendly terms and have always co-operated in sharing time with the boys. Ms. H. appreciates the importance of maintaining family ties and facilitates sibling visits. There is no reason to believe that this cooperative relationship will not continue, or that appellant will be unable to maintain a relationship with Ruben and Brandon. (Compare *In re Hirenia C.*, *supra*, 18 Cal.App.4th at pp. 510-511, in which the child's caregiver abruptly cut off all contact with appellant, who had continuous contact with the child for three and one-half years, since birth, and took care of her 130 days a year.)

13

## 2. **Appellant's Motion to Compel**

Appellant appeals the juvenile court's order finding that she lacks standing to compel DCFS to place Ruben and Brandon in her home. "It is well settled that a de facto parent of a dependent minor has standing to participate as a party in juvenile court proceedings in which decisions about the care, custody, and control of the child will be made." (*In re Hirenia C.*, *supra*, 18 Cal.App.4th at p. 513; *In re B.G.* (1974) 11 Cal.3d 679, 693.) As discussed in section 1, *ante*, the court did not confer de facto parent status on appellant. Without de facto parent status, a caretaker who is a prospective adoptive parent is not a party to the dependency proceeding and has no standing to object to actions taken by the child protective services agency. (Welf. & Inst. Code, § 366.26, subd. (n)(3)(C); *R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 372.)

Even if appellant lacked de facto parent status, she may nonetheless be a "'person with an interest'" in Ruben and Brandon, though this generally requires a petition for a modification. (*In re Hirenia C.*, *supra*, 18 Cal.App.4th at p. 515.) Appellant is the mother of Ruben's alleged father, Victor C., and she cared for the boys in her home on a full-time basis for one year. Under these circumstances, she has an interest in the companionship, care, custody and management of the children. (*In re B.G.*, *supra*, 11 Cal.3d at p. 693.)

When the juvenile court places dependent children, it "must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards." (*In re B.G.*, *supra*, 11 Cal.3d at p. 693.) In this instance, Ruben and Brandon were removed from appellant's custody owing to a detrimental environment. This stemmed from the cruel attitude of appellant's daughter Elizabeth toward the boys, causing them trauma, and appellant's failure to take court-ordered classes. The social worker observed worrisome behavior during a visit, provoking DCFS to file a supplemental petition under Welfare and Institutions Code section 387.

On August 1, 2012, the court found a prima facie case for removing the boys from appellant's home. In subsequent reports, the social worker noted that appellant "screams

at the boys constantly to the point that the boys are totally tuning her out," and there were screaming matches between appellant, Elizabeth, and Donavan, using bad words. Donovan confirmed that the fighting and crying was an increasing problem over the last five months. Appellant relied upon Donovan to control the boys' behavior, apparently because they feared Donovan. There is no evidence that Donovan plans to remain in appellant's home forever to help her care for the boys. Appellant failed to take court-ordered classes to learn coping skills for parenting special-needs children.

In all, appellant's home was chaotic, and she was unable to set appropriate boundaries for any of the children, including her adult children. Appellant complained that Ruben was disruptive, argumentative and did not follow rules. She seemed unable to teach her biological children or foster children how to treat her and others with respect and civility. This could be an increasing difficulty as appellant approaches age 70 with two children in the house. Appellant admitted to bribing Elizabeth with a car to convince her to cooperate with DCFS. Elizabeth disparaged appellant's abilities, noting that one of appellant's adoptees (Ruben's father Victor C.) is incarcerated for 20 years and another adoptee died of drug overdose. As late as May 2012, after nearly a year with appellant, Ruben and Brandon were "torn" about living with appellant or living with Ms. H. and their little brother Brian, and appellant was unable to say when, if ever, her biological children would come to accept the boys.

After DCFS removed the boys from appellant in July 2012, the court refused appellant's requests to have the boys placed back in her care because of continuing concerns about the suitability of appellant's home. Ruben and Brandon were happy and comfortable in the home of Ms. H., where they were strongly bonded to Ms. H., her son, and their brother Brian. There is no evidence of screaming, cussing, tantrums, crying, or other such drama in the home of Ms. H. The boys accepted the prospect of living with either appellant or Ms. H.

DCFS ultimately dismissed its supplemental petition. In appellant's view, the boys had to be returned to her home after DCFS dismissed the petition. The court did not agree with appellant. After detaining the children and hearing additional evidence over

15

four months, the court decided that there are sufficient concerns about appellant's household that the boys should not be returned to her care. It was not that the court "had enough" of appellant, as she suggests in her brief; rather, it "had enough" evidence that appellant's home was unsuitably chaotic for Ruben and Brandon, so that they would be better off with someone they have known their entire lives and call their "aunt" or "nana."

The court must continually reassess the "appropriateness of the placement" while exercising dependency jurisdiction, taking into account the discretion that DCFS has in choosing a suitable home for minor children. (Welf. & Inst. Code, § 366.3, subd. (e)(1); *In re Jacob E.*, *supra*, 121 Cal.App.4th at p. 922.) It appropriately did so here, when selecting between two prospective adoptive families. Though appellant believes that her right to custody was fixed in June 2011, the court alerted her on May 22, 2012, that it was ordering concurrent adoptive home studies for her and Ms. H., and intended to "look to see what would be in the best interest of the children after further review." There was no abuse of discretion and no violation of appellant's rights.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

16