Filed 6/6/14  Certified for publication 6/30/14 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E058270 |
| Plaintiff and Respondent, | (Super.Ct.No. J239433-34) |
| v. | O P I N I O N |
| S.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Reversed with directions.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Phebe W. Chu, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant and appellant, S.L., was granted de facto parent status of twins, a boy and a girl, who were born premature and medically fragile. Plaintiff and respondent, San Bernardino County Children and Family Services (CFS), removed the twins from S.L. on February 17, 2013, when the twins were 23 months old and had been living with S.L. and her family for 14 months, and placed them with a couple who were willing to adopt them. The twins were removed solely because S.L. and her husband had once hesitated to adopt them, even though the L.'s renewed their commitment to adoption *before* the twins were removed and, by all accounts, the twins were strongly bonded to the L. family and the L.'s had taken outstanding care of the twins.

At the March 5, 2013, Welfare and Institutions Code section 366.26[1] hearing, the juvenile court refused S.L.'s noticed request to return the twins to her care, vacated her de facto parent status, and denied her request for appointed counsel. S.L. claims the court violated her procedural due process rights to be heard and present evidence.

We reverse the March 5, 2013, orders to the extent they refused to return the twins to the L.'s and allow them the chance to adopt the twins. We also reverse the court's related April 25, 2013, order summarily denying S.L.'s section 388 petition seeking the return of the twins. On this record, it appears the court completely failed to consider, at the March 5 hearing, whether the twins' removal and new placement were in their best

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

interests.  Remand is necessary for the court to consider whether it is in the twins' best

interests to be returned to the L.'s, and that the L.'s be given a chance to adopt them,

based on the twins' circumstances on remand.

## II.  BACKGROUND

The twins were born medically fragile at 25 weeks gestation in 2011.[2]  They were

taken into protective custody in November 2011, when they were nine months old, after

the male twin suffered a nonaccidental femur fracture in the mother's custody and was

failing to thrive.  The mother was incarcerated and charged with child cruelty.[3]  (Pen.

Code, § 273a, subd. (a).)

CFS placed the twins with S.L., who cared for them from November 2011 until

February 17, 2013, when CFS removed them from S.L.'s care.  S.L. was a "stay-at-home

mom"; her husband, Mr. L., worked in the family-owned furniture store and helped care

for the twins.  The L.'s 16-year-old daughter also helped care for the twins.  S.L. was

appointed to hold the twins' educational rights so the twins could receive Inland Regional

Center services.

A November 2012 status report stated the twins had made "tremendous progress

developmentally," had "a strong and healthy bond" with S.L. and her family, and S.L.

---

[2]  At birth the twins had numerous medical concerns, including bacterial and lung infections.  Each twin was at risk for vision and hearing impairment, brain bleeding, cerebral palsy, sudden infant death syndrome, and learning disorders.

[3]  The mother is not a party to this appeal.  An alleged father, A.O., denied paternity and no other possible father was identified.

3

and Mr. L. had agreed to adopt the twins. On November 5, the mother's services were terminated and a section 366.26 hearing was set for March 5, 2013.

In December 2012, S.L. told CFS she "didn't think" she and Mr. L. could adopt the twins. But by January 23, 2013, S.L. was committed to adoption and filed a De Facto Parent Request and Statement. In an attachment, S.L. explained why she had hesitated to commit to adoption: she and Mr. L. were having marital problems during 2012, and by November 2012 they were unable to reconcile their differences after 20 years of marriage. By December 2012, S.L. decided the twins would be "better off with [a] full family unit." But "[a]fter much thought and prayer," S.L. changed her mind and was committed to adopting the twins because it would be "cruel and devastating" to remove them from "the only home and family that they have known." On January 28, the court signed an order granting S.L.'s de facto parent request.[4]

Notwithstanding S.L.'s de facto parent status, CFS removed the twins from S.L.'s care on February 17, 2013, and placed them in a prospective adoptive home following a 10 day "pre-placement visit[]" with the prospective adoptive parents. The prospective adoptive parents were in their early 30's, had been married 11 years, and had no children. S.L. pleaded with CFS not to remove the twins from her care.

CFS filed its section 366.26 report on February 25, 2013. By this time, the twins were 23 months old and were reported to have made "rapid developmental gains" over

---

[4] Mr. L. did not join S.L.'s de facto parent request and did not file his own de facto parent request.

the previous several months.  Speech therapy was the only service they were still receiving; their speech was "slowly emerging"; and they were "walking, running, jumping, climbing and getting into everything."  They were able to feed themselves, helped dress themselves, and enjoyed playing with a variety of toys.  They were "beginning to attach" to their new foster parents who were "thrilled" to have them and willing to adopt them.

Also on February 25, 2013, S.L. filed a Caregiver Information Form, advising the court that she and Mr. L. very much wanted to adopt the twins.  In an attached letter, Mr. L. explained that both twins required 24-hour care during the first nine months of their placement, and when he and S.L. were first asked to make the decision about adoption, they hesitated because they and their family were "physically and emotionally exhausted" from caring for the twins.  The twins' medical appointments had been "numerous and lengthy," the male twin had been on 24-hour oxygen, and "[f]or months [the family] ran [from] one store to another just to get one can" of the dietary formula the twins needed.  Mr. L. and his family loved the twins and the twins loved them.  Mr. L. and S.L. had reconciled their marital differences and their 20-year marriage was strong and stable.  Both the case manager and the foster care social worker from the Hugs Foster Family Agency wrote letters to the court recommending that S.L. and Mr. L. be allowed to adopt the twins.

At the March 5, 2013, section 366.26 hearing, S.L. and Mr. L. appeared, requested court-appointed counsel, and asked that the twins be returned to their care.  The L.'s told

5

the court they were no longer hesitant to adopt the twins and told the social worker they were committed to adoption before the twins were removed from their care on February 17. The social worker explained that the L.'s had waited until November 2012 to "finally" decide they were willing to adopt, but changed their minds in December 2012, saying they "didn't think" they could adopt. For that reason, in December 2012, CFS advised the L.'s that it would try to find an adoptive family for the twins. A prospective adoptive family was found, and the twins were placed with that family on February 17.

The twins' counsel argued that S.L.'s de facto parent status was "moot" because the twins had been removed from her care. The court agreed, saying the removal of the twins rendered S.L.'s de facto parent status "a nonissue." Regarding S.L. and Mr. L.'s renewed willingness to adopt the twins, the court said: "Too bad. You can't treat children like they're possessions. They're people. I mean, I would believe that the social worker talked to the lawyers about adopting these children from day one. Without a commitment, they [CFS] have to do something. The children aren't going to be moved [from their prospective adoptive home]."

The court terminated parental rights and chose adoption as the twins' permanent plan. County counsel then made an oral motion to "vacate" S.L.'s de facto parent status on the ground "it just terminates by operation of law when the child is adopted." S.L. opposed the motion and asked the court to appoint counsel to represent her in seeking to adopt the twins. The court vacated S.L.'s de facto parent status and denied her request for appointed counsel.

6

On March 18, 2013, the court reinstated S.L.'s de facto parent status by signing an order granting a section 388 petition by the twins' counsel. The petition explained: "De Facto Parents were not given an opportunity to be heard when De Facto status was terminated and they wish to maintain status as De Facto Parents."

On April 25, S.L. filed a section 388 petition seeking the return of the twins to her care. In her petition, S.L. stated she had appealed the March 5 orders, sought visitation with the twins pending her appeal, and claimed that returning the twins to her would be better for them because she and Mr. L. shared a strong bond with them and were well-equipped to care for them. The L.'s had raised two children, and as a stay-at-home mom S.L. could offer the twins the "special life" they deserved. By contrast, the new prospective adoptive parents were "two busy working young adults," and the twins had been "thrust into day care" after 14 months of one-on-one care with the L.'s.

The court summarily denied S.L.'s April 25 petition without a hearing. On form JV-183 (Court Order on Form JV-180), the court wrote, "Defacto status was reinstated," but did not check any of the preprinted boxes on the form to indicate that it was denying the petition or why it was denying the petition. In any event, the court did not set a hearing on the April 25 petition. S.L. appeals the court's March 5 and April 25 orders.

### III. DISCUSSION

S.L. claims the court erroneously failed to exercise its discretion and also denied her procedural due process rights in summarily denying her section 388 petition without a hearing. She claims she presented sufficient evidence to warrant a hearing on her petition

7

seeking the return of the twins to her care, including that the twins were bonded to her and her family and would suffer significant harm if not returned.

We agree the court erred, but the error is more fundamental and was made at the March 5 hearing, before the court summarily denied S.L.'s section 388 petition. It is unclear from the record whether, at the March 5 hearing, the court made any effort to determine if CFS's then-recent removal of the twins from the L.'s, based solely on the L.'s previous hesitancy to adopt, was in the best interests of the twins. (*In re B.G.* (1974) 11 Cal.3d 679, 693 [in dispositional hearings, the court "must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards."].)

At the March 5 hearing, the court treated the issue of the twins' removal from the L.'s as a contest between the twins' counsel and CFS, who favored the twins' removal and their new adoptive placement, and the L.'s, who were seeking the twins' return and the opportunity to adopt them. The court apparently lost sight of S.L.'s primary role as a de facto parent: providing information to the court concerning the twins' best interests. (See *In re Patricia L.* (1992) 9 Cal.App.4th 61, 66-67.) More importantly, the court lost sight of the key question it had to determine at the March 5 hearing: what placement was best for the twins.

A. *The De Facto Parent Doctrine*

In the seminal case *In re B.G., supra,* 11 Cal.3d 679, the California Supreme Court established the right of de facto parents to "appear as parties" in dependency proceedings.

8

(*Id*. at pp. 692-693.)  The de facto parent doctrine is an "important rule of procedure" which "recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding."  (*In re Kieshia E.* (1993) 6 Cal.4th 68, 70-71, 77.)  De facto parent status is "a judicially created and maintained concept" (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 383, fn. 5) which is not incorporated into the statutory dependency scheme but is recognized in court rules (Cal. Rules of Court, rules 5.502(10) (defining de facto parent), 5.530(a) (right to be present at court proceedings), 5.534(e) (standing to participate and procedural rights)).[5]

"'De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period."  (Rule 5.502(10).)  A person seeking de facto parent status is required to file a written request and show by a preponderance of the evidence that he or she qualifies as a de facto parent.  (*In re Patricia L., supra,* 9 Cal.App.4th at p. 67.)  Whether a person qualifies as a de facto parent "depends strongly on the particular individual seeking such status and the unique circumstances of the case," and should ordinarily be liberally granted because the court "can only benefit from having all relevant information" concerning the best interests of the child.  (*Id*. at pp. 66-67.)

_____

[5]  All further references to rules are to the California Rules of Court.

9

Relevant factors the court should consider in determining whether to grant a de facto parent request include whether the child is psychologically bonded to the adult, whether the adult has assumed the role of a parent on a day-to-day basis for a substantial period, whether the adult possesses information about the child that other participants do not possess, whether the adult has regularly attended juvenile court hearings, and whether a future proceeding may result in an order permanently foreclosing any future contact with the adult.  (*In re Patricia L., supra,* 9 Cal.App.4th at pp. 66-67; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 602.)  Once granted, a person's de facto parent status "ends only when the dependency is terminated or a changed circumstance no longer supports the status."  (*In re Leticia S., supra,* 92 Cal.App.4th at p. 383, fn. 5.)  In order to terminate a person's de facto parent status before the dependency jurisdiction has terminated, the social services agency must file a noticed motion and show by a preponderance of evidence that changed circumstances warrant terminating the person's de facto parent status.  (*In re Patricia L., supra,* at p. 67.)

De facto parents do not have the same substantive rights and preferences as parents or even legal guardians.  (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371; see *In re B.G., supra,* 11 Cal.3d at p. 693, fn. 21.)  De facto parents have no right to reunification services, visitation, custody, continued placement of the child (*In re P.L.* (2005) 134 Cal.App.4th 1357, 1361 [Fourth Dist., Div. Two]), "or to any degree of independent control over the child's destiny whatsoever" (*In re Kieshia E., supra,* 6 Cal.4th at p. 82 (dis. opn. of Kennard, J.)).  De facto parent status "merely provides a way

10

for the de facto parent to stay involved in the dependency process and provide information to the court." (*In re Bryan D.* (2011) 199 Cal.App.4th 127, 146.)

De facto parents have significant *procedural* rights in dependency proceedings, including (1) the right to be present at hearings, (2) the right to be represented by retained counsel, and in the discretion of the court, appointed counsel, and (3) the right to present evidence and be heard. (*In re P.L., supra,* 9 Cal.App.4th at p. 1361; rule 5.534(e).) The extent of a de facto parent's right to present evidence depends on the relevant circumstances (Cf. *In re Matthew P.* (1999) 71 Cal.App.4th 841, 851 [de facto parents denied their procedural due process right to cross-examine social worker on contents of her social study]; *In re Damion B.* (2011) 202 Cal.App.4th 880, 889 [de facto parents not completely "shut out" of proceeding and their opinions were sufficiently heard].) By exercising their procedural rights to appear, participate, and present evidence, de facto parents may "'assert and protect their own interest in the companionship, care, custody and management of the child,'" and "'ensure that all legitimate views, evidence, and interests are considered . . . .'" (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 693.)

The key reason for affording de facto parents standing to appear and participate is so they may provide critical information that assists the court in determining what disposition is best for the child. (See *In re B.G., supra,* 11 Cal.3d at pp. 692-693.) As explained in *In re B.G.*: "The juvenile court in a dispositional hearing must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards. [Citation.]

11

The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate." (*Id*. at p. 693.)

B. *Reversal is Required Because the Record is Inadequate to Permit Meaningful Review*

Reversal of the court's March 5 and April 25, 2013, orders is required—to the extent the orders refused to return the twins to the L.'s—because it is unclear from the record whether the court considered the best interests of the twins in denying S.L.'s request for their return at the March 5 hearing.

*In re M.V.* (2006) 146 Cal.App.4th 1048 (*M.V.*) is instructive. There, the social services agency filed a section 388 petition to approve the removal of 20-month-old M.V. from the care of his de facto parent, where he had been living for 16 months, and place him in another foster home. (*Id*. at p. 1051.) The petition alleged the family's dog had bitten M.V. on the face, the de facto parent and her husband had not taken the matter seriously, and M.V. therefore was at risk of further injury. (*Ibid*.)

Following an evidentiary hearing on the petition, the court expressed concern that the de facto parent and her husband had minimized M.V.'s injuries and granted the motion, saying: "'When I look at these photographs [of M.V.'s injuries] and know there was a prior injury to [the de facto parent's child] by this same animal, I can do nothing but grant the motion.'" (*M.V., supra,* 146 Cal.App.4th at pp. 1054-1056.) At the time of

the hearing, M.V. had already been placed with another foster family.  (See *id*. at p. 1055.)

M.V. found the juvenile court's factual findings inadequate to support a finding of changed circumstances, or that the proposed placement change was in M.V.'s best interests.  (*M.V., supra,* 146 Cal.App.4th at pp. 1059-1060; § 388.)  The de facto parent and her husband (M.V.'s original foster parents) both testified they realized they made a serious mistake in leaving 20-month-old M.V. alone with the dog and their 14-year-old daughter, and were willing to remove the dog from their home.  (*Id*. at p. 1060.)  Nothing in the record contradicted their testimony that the dog would not remain in their home.  (*Id*. at p. 1061.)  But because the lower court commented *only* on M.V.'s undisputed injuries, and none of the other evidence presented at the hearing, it was unclear from the record whether the court found the original foster parents' testimony not credible or simply failed to consider it.  (*Ibid*.)

More importantly, the critical question the juvenile court had to determine was whether M.V.'s change of placement was in his best interests, but nothing in the record showed the court had even considered M.V.'s best interests.  (*M.V., supra,* 146 Cal.App.4th at p. 1061.)  The *M.V.* court was "especially concerned" that the court-appointed special advocate and counsel for M.V. had both recommended that M.V. remain with his original foster family—as long as the dog was removed from the home.  (*Id*. at pp. 1055, 1061.)  Both visited M.V. in his new foster home and were concerned he might suffer psychological damage as a result of being separated from his original foster

13

family.  Both saw that M.V. had become "withdrawn," and opined he was bonded to his original foster family and wanted to be returned to them.  (*Id.* at p. 1061.)  But nothing in the record indicated that the juvenile court "even grappled with the assessments of the [court-appointed special advocate] and attorney for M.V. and the consequences of severing the bond" between M.V. and his original foster family.  (*Ibid.*)

Accordingly, the *M.V.* court concluded that the juvenile court's factual findings were inadequate to permit meaningful appellate review of the order granting the agency's section 388 petition.  (*M.V., supra,* 146 Cal.App.4th at p. 1062.)  The *M.V.* court went on to observe that in "this very troubling case," "many people" had "let young M.V. down." (*Ibid.*)  The juvenile court let M.V. down "by not making the appropriate findings and by not making it clear in its findings that it considered the bond M.V. had developed" with his original foster family in granting the section 388 petition.  (*M.V., supra,* at p. 1062.) The appellate process also let M.V. down, because the *M.V.* court was reviewing the section 388 order more than a full year after M.V. was removed from his original foster family.  (*M.V., supra,* at p. 1062.)

The court reasoned that when a juvenile dependency proceeding involves a young child's out-of-home placement, "it is obvious that *time is of the essence,*" and the lengthy delay in hearing the de facto parent's appeal "seriously hamper[ed]" the appellate court's ability to ensure that M.V.'s best interests were protected."  (*M.V., supra,* 146 Cal.App.4th at p. 1062.)  Finally, on remand, the juvenile court was directed to make findings addressing, among other things, M.V.'s "*current* circumstances."  (*Ibid.*)  M.V.'s

14

*current circumstances* might compel a finding he should not be returned to his original foster family, because he had already spent more than a year of his young life in the care of others, and the further disruption might add to his injuries. (*Ibid.*)

This case is strikingly similar to *M.V.*, except that here CFS did not file a section 388 petition to approve its removal of the twins from S.L., after she became the twins' de facto parent. (Cf. *M.V. supra,* 146 Cal.App.4th at p. 1051.) S.L. was granted de facto parent status on January 28, 2013, and CFS removed the twins from her care on February 17, after telling her in December 2012 that it would be seeking an adoptive family for the twins. On February 25, S.L. filed a Caregiver Information Form (form JV-290), explaining that she and Mr. L. had hesitated to adopt (they and their family were "physically and emotionally exhausted" from caring for the twins) and affirming they were now committed to adoption and that the twins and the L. family loved each other. CFS proceeded to the scheduled March 5 section 366.26 hearing, without filing a section 388 petition to approve the removal, but knowing the L.'s would be asking the court to return the twins and allow them the chance to adopt.

At the March 5 hearing, there was no section 388 petition pending and the court placed CFS under no obligation to show, by a preponderance of the evidence, that changed circumstances supported the twins' removal, or that the removal was in their best interests. (§ 388.) To be sure, it was undisputed that the twins were removed from the L.'s because the L.'s had hesitated to adopt them after telling CFS, in November 2012, that they were willing to adopt. As this court has recognized, a de facto parent's

15

hesitation to adopt a dependent child, standing alone, is sufficient to support a change of placement order. (*In re P.L., supra,* 134 Cal.App.4th at p. 1362.)

But here, it is unclear from the record that the court made any effort to determine or even considered whether it was in the twins' best interests to be removed from the L.'s and placed with the young couple in their 30's, who were *also* willing to adopt them. (*M.V., supra,* 146 Cal.App.4th at p. 1061.) Much evidence before the court indicated the removal was and would continue to be harmful to the twins: the twins were 23 months old when they were removed from the L.'s in February 2013; the twins had lived with the L.'s for the previous 14 months; and the L.'s were the only family the twins had ever known. As late as November 2012, CFS reported the twins had made "tremendous progress developmentally," under the care of the L.'s, and had "a strong and healthy bond" with S.L. and her family.

The court should have been acutely aware that the removal of the twins from the L.'s—or the removal of *any* young children from the only caretakers they ever knew— risked causing them significant psychological damage. (See *Katzoff v. Superior Court* (1976) 54 Cal.App.3d 1079, 1085.) But rather than inquire whether the twins would suffer psychological damage from their removal, or whether the L.'s were too unstable to be trusted not to change their minds about adoption again, the court focused on S.L.'s de facto parent status and ruled it was "really a nonissue" because the twins had since been removed from her care.

16

S.L.'s de facto parent status was by no means "a nonissue" at the March 5 hearing. Once the court granted S.L.'s de facto parent request, CFS could not terminate her de facto parent status without filing a section 388 petition and showing by a preponderance of the evidence that changed circumstances warranted the termination *and* that the termination was in the best interests of the twins. (*In re Patricia L., supra,* 9 Cal.App.4th at p. 67; *In re Leticia S., supra,* 92 Cal.App.4th at p. 383, fn. 5; § 388.) But rather than require CFS to make these showings, the court allowed CFS to make an unsupported, oral motion to terminate S.L.'s de facto parent status, and granted the motion.

Worse, the court completely disregarded the information S.L. had to offer on the most important issue the court had to determine: whether the removal of the twins from S.L. was in their best interests. (*Katzkoff v. Superior Court, supra,* 54 Cal.App.3d at pp. 1083-1084 [court abused discretion in refusing to consider any evidence from the de facto parents concerning whether continued placement of child with them was in the child's best interests].) During the entire hearing, the court did not once mention or refer, even obliquely, to the "strong and healthy bond," the twins had with the L. family, or to the "tremendous progress" they had made under the care of the L.'s. Instead, the court lectured the L.'s that the twins were not "possessions," though no one had ever suggested the L.'s had treated the twins like possessions. The court treated the removal issue as an adversarial contest between CFS and the twins' counsel, who supported the removal and new placement, and S.L., who was seeking the twins' return and a chance to adopt them.

17

In the process, the court completely lost sight of whether the removal was in the twins' best interests. (*Katzoff v. Superior Court, supra,* 54 Cal.App.3d at p. 1085.)

The court also gave short-shrift to S.L.'s request for appointed counsel, denying the request on the ground the court had just vacated S.L.'s de facto parent status. Though an indigent de facto parent has no *right* to appointed counsel (see *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1196-1197), the juvenile court has *discretion* to appoint counsel for an indigent de facto parent (*In re Kieshia E., supra,* 6 Cal.4th at p. 77, fn. 7; rule 5.534(e)(2)). Here, there was no showing S.L. was indigent, but on remand S.L. must be allowed to renew her request for appointed counsel, if she chooses and can establish she is indigent. (See generally *In re Vincent C.* (1997) 53 Cal.App.4th 1347, 1359 [remand with directions to appoint attorney to represent de facto parent].)

In summary, on this record we cannot say that the juvenile court did not abuse its discretion in refusing to order the twins returned to the L.'s at the March 5 hearing and allow the L.'s the chance to adopt the twins.

## IV. DISPOSITION

The March 5 and April 25, 2013, orders are reversed to the extent they approved the February 17, 2013, removal of the twins from the care of their de facto parent, S.L.,

18

and denied S.L. and her husband the chance to adopt the twins.  The matter is remanded to the juvenile court with directions to reconsider whether to place the twins with the L.'s and allow the L.'s a chance to adopt the twins, in light of the twins' current circumstances and best interests on remand.  (*M.V., supra,* 134 Cal.App.4th at p. 1062.)

KING

Acting P. J.

We concur:

MILLER

J.

CODRINGTON

J.

Filed 6/30/14

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH DISTRICT

DIVISION TWO

**ORDER**

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | E058270 |
| _____ | (Super.Ct.No. J239433-34) |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | The County of San Bernardino |
|     Plaintiff and Respondent, | |
| v. | |
| S.L., | |
|     Defendant and Appellant. | |

THE COURT

    Requests having been made to this court pursuant to California Rules of Court,

rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above

1

entitled matter on June 6, 2014, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

KING
               Acting P.J.

I concur:

CODRINGTON
       J.

2