Filed 8/27/15  In re. Ella S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ELLA S., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KIM M.,<br><br>    Defendant and Appellant. | A143338<br><br>(Alameda County<br>Super. Ct. No. OJ07007935) |

Kim M., the legal guardian of minor Ella S., appeals from the order of the juvenile court granting the maternal grandfather de facto parent status.  Appellant contends an insufficient showing was made to support the court's order.  We affirm.

**STATEMENT OF THE CASE AND FACTS**

Ella S. was removed from her mother's custody in September 2007, when she was three years old, after her mother was arrested for shoplifting and briefly incarcerated. There were no known relatives available for placement and Ella was placed in appellant's foster home.[1]  She was subsequently declared a dependent of the juvenile court.  The

_____

[1] The mother refused to cooperate with providing basic information to the Alameda County Social Services Agency (Agency), including her address and the child's birth certificate.  She stated that the child was born in a village in Sudan.  The Agency

1

mother's reunification services were terminated in November 2008 and a section 366.26 hearing was set for February 2009.

Appellant was interested in adopting Ella and the Agency recommended a permanent plan of adoption. The mother had been visiting regularly and the court, on March 26, 2009, declined to terminate parental rights and ordered a plan of legal guardianship.[2] By early August 2009, however, the mother's previously consistent visiting had stopped and on September 4, the court suspended the mother's visitation, set aside its order appointing a legal guardian, and ordered a permanent plan of adoption.[3] A section 366.26 hearing was set for December 28, 2009.

In September, in attempting to locate and serve the mother, the Agency conducted a formal search that included obtaining her birth certificate and sending letters to her parents. On September 14, maternal grandfather Arthur S. came to the Agency office, saying he had no prior knowledge of Ella's existence, he wanted visitation and he wanted to have Ella placed with him.[4] After this meeting, Arthur wrote to the Agency, stating his intention to raise Ella and wanting to know why it took two years to contact him. Other letters in the record document Arthur's frustration over trying to meet Ella and what he described as the Agency's withholding of information and discouraging him from coming forward to raise his granddaughter.

Arthur's first visit with Ella took place on October 9, 2009. From this point forward, Arthur attended all but a few of the court hearings in the case.

eventually obtained a court "Order Establishing Fact of Birth." The Agency was unable to locate the alleged father.

[2] Ella and the Agency appealed, and this court affirmed the trial court's decision in an opinion filed in December 2009.

[3] In its report for the section 366.26 hearing set for February 2009, the Agency had reported that the adoption home study had been put on hold due to appellant's financial situation; in the addendum report for the hearing in March, the Agency had reported that the issues were almost resolved.

[4] The mother's attorney informed the Agency that the mother was "extremely upset" that her family had been contacted and "emphatically opposed" to visitation or placement with her family members.

On October 13, 2009, the court granted appellant's request for de facto parent status.

Over the next months, the Agency sought and obtained continuances of the section 366.26 hearing in order to further evaluate the permanent plan. Arthur and other maternal relatives had been visiting with Ella and speaking with her on the telephone, and Arthur was paying for Ella to take a dance class; by the time of the Agency's report for an April 1, 2010, hearing date, Arthur was visiting with Ella almost weekly. Appellant had been "extremely supportive" of Ella getting to know her maternal relatives. Appellant remained committed to providing a permanent home for Ella but, because of the introduction of the maternal family, felt uncomfortable about adoption and wanted to proceed with legal guardianship. Toward the end of June, the Agency reported that appellant had established a strong relationship with Arthur and they were working to facilitate Ella's relationships with maternal relatives. The Agency recommended establishing a guardianship with appellant, stating that moving Ella from the placement where she had lived for almost three years would be "absolutely devastating and not in her best interest." The court ordered a permanent plan of legal guardianship on September 9 and, on September 14, appointed appellant legal guardian and issued letters of guardianship.

As of February 2011, the Agency reported that Ella had been "absolutely integrated" into appellant's "loving family" and appeared "very happy" in appellant's home. Since August 2010, Ella had been spending three to four weekends a month with Arthur. Arthur had expressed interest in having Ella placed with him "sometime in the future, theoretically when Ella is old enough to express her own preference for his home." The child welfare worker (CWW) opined that "[r]egular and extensive contact with her maternal family seems to have only made Ella feel more secure in her current living situation."

The dependency was continued at hearings in February and August 2011, and January 2012, as the Agency continued to attempt to resolve issues concerning Ella's

missing birth certificate and consequent difficulties confirming her citizenship and obtaining a social security number for her.

On July 10, 2012, the Agency recommended changing the permanent plan to adoption. Appellant felt that Ella, now seven years old, deserved a "permanent and legal parent" and Arthur, while extremely dissatisfied with the Agency's handling of the case (especially concerning placement and failure to notify the biological family), "felt that if adoption would help Ella become all she could be, he could accept it." Appellant remained committed to maintaining Ella's ties to her extended birth family. A section 366.26 hearing was set for January 15, 2013.

In July 2012, Ella began to verbalize a desire to live with Arthur. Appellant reportedly did not want to obstruct this if it was truly what Ella wanted, and Ella voluntarily re-entered counseling to help explore the issue. The parties and CWW agreed that Ella should spend longer periods of time with Arthur to help let her understand what daily life would be like in his home. Ella had longer visits with Arthur over the summer, then returned to weekend visits when school started. Arthur wanted Ella to live with him and felt "her place is with her family," but told the CWW he was open to Ella making her own decision. In October, Ella told the CWW she wanted to live with Arthur "one day"; asked when she saw herself moving, Ella "first said when she was 100, then when she was 14, then changed it again to 12."

The section 366.26 hearing date was vacated and the case continued for review in May 2013, at which time the Agency recommended that Ella remain in appellant's home. Ella was reported to be ambivalent about her placement, telling the CWW she " 'kinda does and kinda doesn't' " want to move to Arthur's home and, although continuing to spend most weekends with Arthur, choosing to stay with appellant more often than before.

The Agency's recommendation remained the same at the next review hearing in November 2013. Ella continued to have conflicted feelings about her long term living situation; she was reportedly happy living with appellant but said she "might like to live with" Arthur. The Agency described the question of appropriate permanent plan as

4

intertwined with the issue of Ella's citizenship, as there was a question whether adoption would facilitate obtaining citizenship, and recommended putting off a final decision on the permanent plan until further research was completed. The case was again continued.

At the November 13 hearing, Arthur formally requested that Ella be placed with him. The Agency approved his home for placement in January 2014.

On February 14, 2014, Ella's attorney sought a court order prohibiting a change of placement absent exigent circumstances or further court order after hearing, stating that the Agency was planning to move Ella from appellant's home without court permission and against appellant's wishes. The court appointed counsel for appellant and set a hearing for April 1. According to the Agency, Ella had been saying she wanted to live with Arthur and the Agency was evaluating this option; appellant, despite prior expressions of support, had responded by changing visitation plans and at times saying she wanted to stop Ella's visitation with Arthur.

At home visits in March, appellant explained that she was offended by an Emergency Response Referral made at the end of February and felt disrespected by Arthur.[5] Appellant agreed to Arthur having visitation every other weekend and wanted a more concrete visitation plan because there was now conflict between the families. She also suggested a visitation plan calling for alternating two-week periods in which Ella would spend weekdays with Arthur and weekends with appellant, then switch to weekdays with appellant and weekends with Arthur. Appellant reiterated that she would not do anything to stop Ella if Ella truly wanted to move to Arthur's home. Ella was upset about the changes in visitation. She told the CWW she had written a letter to the court requesting to move to Arthur's home and asked the CWW to get the letter from

---

[5] Although it is not directly explained in the record, it would appear that this referral related to appellant getting married on February 18 and having her husband move into her home without "proper clearance." Appellant chose to relinquish her foster care license and pursue a "NREFM" (Non-Related Extended Family Member) home approval rather than have her husband move out.

5

appellant's home; appellant refused to give the letter to the CWW, saying she would give it to Ella's attorney.

By April, Ella appeared to have firmly decided she wanted to move to Arthur's home. The Agency intended the alternating two-week visitation plan, which was to start that month, to help determine whether the move would be in Ella's best interests. A hearing was set for June 10 for a progress report on the visitation schedule.

In June, the Agency recommended continuing Ella's placement with appellant and having the parties attend mediation to establish a long term plan for visitation. Ella continued to express wanting to live with Arthur. Her therapist described Ella's "primary parental attachment to be with" appellant and believed severing this attachment would cause emotional trauma. The therapist stated that Ella had conflicting loyalties, partially due to feeling she had to choose between two people who loved her. In the Agency's view, there was not a "clinically significant rationale for disrupting the primary attachment to her current caregiver" but Ella was clearly attached to her biological family, and severing that attachment would be detrimental. The CWW opined that adoption was not an appropriate permanent plan and that "Ella thrived when both parties worked together to raise" her. The Agency supported a visitation plan appellant had suggested, consisting of two weekends per month, a few weeks during the summer, and some holidays as agreed upon through mediation.

On June 5, Arthur asked the court to rescind the existing legal guardianship and make him Ella's legal guardian. An August hearing date was set. Through mediation, a visitation schedule for the summer was established.

In August, the Agency continued to recommend that Ella remain with appellant. The CWW described an incident in which Ella was extremely upset after unexpectedly seeing her mother (for the first time since 2011) at a funeral for a maternal relative. Upon arriving back at appellant's home, Ella told the visiting CWW she was fine but was visibly agitated, then broke down and sobbed inconsolably for nearly 45 minutes as appellant sat with her. Arthur later told the CWW Ella's crying was not due to having seen her mother but rather to her not being able to move to his home. The CWW

6

reported that Ella's statements about wanting to live with Arthur had ceased over the summer, she appeared to be "resolved in continuing her life" at appellant's home and the tension between the parties had "subsided significantly," with "a profound effect on Ella in a positive direction." Pursuant to the court's earlier request, an expert had been retained to evaluate the attachment and bond between Ella and the parties. The hearing on Arthur's request for legal guardianship was continued to October and, through mediation, a visitation was established for September through December.

In September, the Agency continued to recommend that Ella remain with appellant as her legal guardian. The CWW reported that Ella appeared to be content to live with appellant as long as she had liberal visitation with her birth family. Based on observation of Ella in both homes, the CWW stated, "what became clear was Ella's deep parental attachment to her Legal Guardian." Relating Arthur's statements after the funeral that Ella was " 'fine' and unaffected by her mother's appearance," the CWW opined that this response was "indicative of the lack of parental connection that would have allowed him the vulnerable interaction that took place between Ella and her Legal Guardian after the traumatic interaction between Ella and her mother. Further, Ella's willingness and ability to be so vulnerable with [appellant] demonstrated where Ella feels safest despite her statements of wanting to live elsewhere." Appellant was committed to providing permanency for Ella through the legal guardianship and had recently requested an adoption home study, but the Agency viewed Ella as not adoptable because Ella expressed not wanting to be adopted by appellant.

In late September, Arthur filed a request for de facto parent status.

On October 7, the Agency recommended continuing Ella's placement with appellant. The Agency took the position that changing Ella's placement would not be in her best interest because " it would sever[] her primary parental connection and although she's attached to her grandfather, that relationship is unharmed by Ella continuing to reside with her Legal Guardian." The clinical psychologist who conducted the attachment evaluation recommended that Ella remain placed with appellant.

The attachment evaluation, filed on October 7, concluded that Ella was "attached to [appellant] as her primary caregiver." It noted that Ella calls appellant " 'Mom' "; "easily engages and disengages" from appellant; "is comfortable testing behavioral limits"; "makes an effort to structure situations and takes control"; and empathizes with appellant's feelings. The psychologist found that "Ella's attachment to her grandfather is characterized by ambivalence"; that she "responds to his controlling demeanor by being compliant, passive and non-assertive"; that she "tries to meet his expectations with 'perfect' behaviors"; and that she "gives in when he structures situations and exerts control over her actions." The report concluded that "continued placement with [appellant], her primary attachment figure, has the most potential for emotional stability and psychological growth."

At the October 7 hearing, Arthur testified that he first learned of Ella's existence when she was five years old, and immediately contacted the Agency to find out how to gain access to her. It took several months to establish unsupervised visitation, after which Arthur had her "basically every weekend," as well as for longer periods such as two weeks at Christmas in 2012 and 2013. When Ella was with him, Arthur helped her with homework for a minimum of two hours per night. Ella liked to draw and they drew pictures together; he drove her to and from counseling sessions (a total of six times); and he participated in after school programs, such as a walkathon, "until I was stopped." During the period when Ella was with Arthur for alternating two-week periods, he observed that when it was time for her to return to appellant's home, she "became very annoyed" and "indicated that she did not want to go back." Arthur testified that he had attended all court hearings since he learned about Ella. He had never taken Ella to a medical appointment, testifying, "I wasn't allowed"; when his attorney followed up by asking who said he was not allowed, Arthur stated, "I didn't ask." Asked if he had unique information about Ella, Arthur said he did: "I know about her anxieties. I know what makes her upset. I know what she likes. I know what she dislikes." He declined to speculate whether appellant also knew these things. As an example of Ella not liking to be wrong or to be teased, Arthur described a situation when everyone at her school found

out she was in foster care and teased her about it, and Ella felt people did not like her and this was the reason she was still in foster care.[6]

With respect to the factors identified in case law as bearing on de facto parent status (*In re A.F.* (2014) 227 Cal.App.4th 692, 699), the trial court found that Arthur and Ella had a bond, that it had not been established he had information other parties could not provide, that Arthur had regularly attended juvenile hearings in the case, and that it appeared unlikely subsequent juvenile dependency proceedings might result in an order permanently ending contact between Arthur and Ella. The "closer question," the court stated, was whether Arthur had assumed the role of parent on a day-to-day basis. The court noted that Ella had spent almost every weekend with Arthur since she was five years old, as well as "significant periods of time" during the summer and winter breaks, and found that Arthur had "a history with this child that resembles activities of day-to-day living such as helping her with her homework, taking her to various extracurricular and recreational activities. He provides her with guidance and emotional support."

The court granted Arthur de facto parent status and set his request for a change of placement for hearing in December.

Appellant filed a notice of appeal from the order granting Arthur de facto parent status on October 14, 2014.

---

[6] The Agency argued that weekend and holiday visitation was insufficient to establish the day-to-day parental role necessary for de facto parent status, and that the purpose of such status was to give the court access to otherwise unavailable information, but the court received information from the Agency's reports, which described Ella's visits with Arthur, and from appellant. Appellant's attorney noted that appellant had been granted de facto parent status in 2009 and that status had never been terminated, but her research had not indicated there could be only one de facto parent. Arthur's attorney argued that appellant was no longer a de facto parent because she became Ella's legal guardian, with greater rights than a de facto parent. Arthur's attorney analogized to shared child custody situations, in which one parent might have less time than the other but would not be deemed "less of a parent."

## DISCUSSION

"The de facto parent doctrine is an 'important rule of procedure' which 'recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding.' (*In re Kieshia E.* (1993) 6 Cal.4th 68, 70–71, 77.)" (*In re A.F., supra,* 227 Cal.App.4th at p. 699.)  A "[d]e facto parent" is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Rule 5.502(10); *In re A.F.,* at p. 699.)  A person seeking de facto parent status has the burden of proving by a preponderance of the evidence that he or she meets the definition.  (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 602; *In re Patricia L.* (1992) 9 Cal.App.4th 61, 67.)

"Whether a person qualifies as a de facto parent 'depends strongly on the particular individual seeking such status and the unique circumstances of the case,' and should ordinarily be liberally granted because the court 'can only benefit from having all relevant information' concerning the best interests of the child." (*In re A. F., supra,* 227 Cal.App.4th at pp. 699-700, quoting *In re Patricia L., supra,* 9 Cal.App.4th at pp. 66–67.) "Relevant factors the court should consider in determining whether to grant a de facto parent request include whether the child is psychologically bonded to the adult, whether the adult has assumed the role of a parent on a day-to-day basis for a substantial period, whether the adult possesses information about the child that other participants do not possess, whether the adult has regularly attended juvenile court hearings, and whether a future proceeding may result in an order permanently foreclosing any future contact with the adult." (*In re A.F.,* at p. 700; *In re Patricia L.,* at pp. 66–67; *In re Giovanni F. supra,* 184 Cal.App.4th at p. 602.)

" 'The purpose of conferring de facto parent status is to "ensure that all legitimate views, evidence and interests are considered in dispositional proceedings involving a dependent minor." ' (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 256, quoting *In re*

10

*Kieshia E.*[, *supra*,] 6 Cal.4th [at p.] 76.)" (*In re B.F.* (2010) 190 Cal.App.4th 811, 817.) The "key reason for affording de facto parents standing to appear and participate is so they may provide critical information that assists the court in determining what disposition is best for the child. (See *In re B.G.* [(1974)] 11 Cal.3d [679,] 692–693.) As explained in *In re B.G.*: 'The juvenile court in a dispositional hearing must undertake "a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards. [Citation.] The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate.' (*Id.* at p. 693.)" (*In re A.F., supra,* 227 Cal.App.4th at p. 701.)

Accordingly, de facto parents have "significant *procedural* rights in dependency proceedings, including (1) the right to be present at hearings, (2) the right to be represented by retained counsel, and in the discretion of the court, appointed counsel, and (3) the right to present evidence and be heard." (*In re A.F., supra,* 227 Cal.App.4th at p. 700; *In re P.L.* (2005) 134 Cal.App.4th 1357 1361.)

However, "[w]hile de facto parents have 'standing to participate as parties' (rule 5.534(e)), their role is limited and they do not enjoy the same due process rights as parents." (*In re B.F., supra,* 190 Cal.App.4th at p. 817.) Moreover, de facto parents "do not have the same substantive rights and preferences as parents or even legal guardians. (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371; see *In re B.G., supra,* 11 Cal.3d at p. 693, fn. 21.) De facto parents have no right to reunification services, visitation, custody, continued placement of the child (*In re P.L.*, *supra*, 134 Cal.App.4th at p. 1361), " 'or to any degree of independent control over the child's destiny whatsoever' (*In re Kieshia E., supra,* 6 Cal.4th at p. 82 (dis. opn. of Kennard, J.)). De facto parent status 'merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court.' (*In re Bryan D.* (2011) 199 Cal.App.4th 127, 146.)" (*In re A.F., supra,* 227 Cal.App.4th at p. 700.)

We review the trial court's decision on de facto parent status for abuse of discretion. (*In re Bryan D.*, *supra*, 199 Cal.App.4th at p. 141; *In re Giovanni F., supra,* 184 Cal.App.4th at p. 602; *In re Leticia S.* (2001) 92 Cal.App.4th 378, 381; *In re Michael R.* (1998) 67 Cal.App.4th 150, 156.) "An abuse of discretion occurs when the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)" (*In re Leticia S.,* at p. 381.) " ' "In most cases, the lower court does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status." [Citation.]' " (*In re Bryan D.,* at p. 141, quoting *In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.)

Here, of the factors courts have identified as relevant to determining whether an individual should be granted de facto parent status, two were unquestionably met: Ella had a psychological bond to Arthur and Arthur had regularly attended juvenile court hearings in the case. The evidence also supported the court's conclusion that Arthur had assumed the role of a parent on a day-to-day basis for a substantial period of time. Appellant's argument is that she held the role of parent and Arthur only the role of grandparent. But appellant offers no support for the implicit suggestion that there cannot be more than one de facto parent, or more than one person playing a parental role in a child's life. The trial court found that during the time Ella was with Arthur—almost every weekend for several years, and periods of two weeks and more at various times— Arthur assumed this day-to-day role. The evidence before the court supported this conclusion, showing that Ella spent considerable time in Arthur's care, during which time he helped her with homework, engaged in activities with her, and generally attended to her needs. The evidence also indicated that Arthur did as much as circumstances allowed him to do in terms of providing care for Ella: He consistently expressed his desire to have Ella live with him full time, but the status of the dependency case precluded this.

Appellant points us to *Charles S. v. Superior Court* (1985) 168 Cal.App.3d 151, 156, which noted that a grandfather who had had regular visitation with his 16-month-old grandchild and attended all the court hearings pertaining to the child did not fit the

12

California Supreme Court's definition of a de facto parent because he did not "maintain a day-to-day relationship with his grandson." The factual situation in *Charles S.* bears little resemblance to the present case. The regular, but limited, visitation in *Charles S.* in no way compares with the amount of time Ella spent in Arthur's care, and the evidence demonstrates that Ella had a psychological bond with Arthur that was not a factor in *Charles S.* Further, while the grandfather in *Charles S.* did not meet the definition of a de facto parent, *Charles S.* held that the juvenile court had erred in denying his request to participate in the proceedings. (*Id.* at pp. 156-157.)

Appellant also offers several cases holding that grandparents were entitled to de facto parent status where the children in question had resided with them for considerable periods of time. (*In re Patricia L., supra,* 9 Cal.App.4th at p. 65 [first three years of child's life]; *In re Ashley P.* (1998) 62 Cal.App.4th 23, 25 [two years]; *In re Vincent C.* (1997) 53 Cal.App.4th 1347, 1358 [three years]; *In re Giovanni F., supra,* 184 Cal.App.4th at p. 602 [first nine months of life].) These cases are not particularly instructive for the one before us, in which Ella clearly had a de facto parent with whom she primarily resided—appellant—and the question is whether the nature of her relationship with Arthur was such that he *also* met the definition of de facto parent. That Arthur was not Ella's *primary* caretaker, at least in the circumstances presented here, does not necessarily mean he could not meet the definition. Cumulatively, the time she spent in his care was considerable, and Arthur wanted, but was not permitted, more time with Ella. As we have said, appellant offers no support for her implicit argument that only one of the two parties could qualify as a de facto parent—that because she was the primary caretaker, Arthur's role of grandfather was necessarily insufficient to so qualify. But despite Ella having appellant as her primary caretaker, the evidence clearly supported viewing Arthur as having provided her, during the considerable time she spent with him over the five years at issue, " 'with daily parental concern, affection, and care over substantial time' " and having developed " 'legitimate interests and perspectives' " to be considered in these proceedings. (*In re A.F., supra,* 227 Cal.App.4th at p. 699, quoting *In re Kieshia E., supra,* 6 Cal.4th at p. 77.)

This is not to say that Arthur's "parental" role in Ella's life was stronger or even as strong as appellant's; that question is not relevant, because the question whether Arthur qualified as a de facto parent does not depend on a comparison of his role to appellant's. Such a comparison would be relevant in determining questions about legal guardianship and placement. The issue before us is far more limited. Recognizing Arthur as a de facto parent permits him to participate more fully in the proceedings and provide relevant information to the court. It does not give him further rights: De facto parent status does not even provide an automatic right to receive Agency reports and other documents filed with the court in a juvenile court case (*In re B.F., supra,* 190 Cal.App.4th at pp. 817-818); it provides no rights with respect to placement and custody. (*In re A.F., supra,* 227 Cal.App.4th at p. 700.)

Nor does recognizing Arthur as a de facto parent imply any diminution of appellant's role. De facto parent status simply allows Arthur to participate in this case, to offer the court his perspective and assert the interests he has developed in his relationship with his granddaughter. As indicated above, "the juvenile court can only benefit from having all relevant information bearing on the best interests of the child, and de facto status should be liberally granted. (*In re Hirenia C.* (1993) 18 Cal.App.4th 504, 514; *In re Patricia L., supra,* 9 Cal.App.4th at p. 67.) 'The simple fact that a person cares enough to seek and undertake to participate goes far to suggest that the court would profit by hearing his views as to the child's best interests . . . .' (*In re B.G.* [, *supra,*] 11 Cal.3d [at p.] 692, fn. 18.)" (*In re Ashley P., supra,* 62 Cal.App.4th at p. 27.) As has been observed, "where a grandparent or other close relative has cared for a dependent child for an extended period of time and has never done anything to cause substantial or serious harm of any kind to that child, there ought to be a very good reason for denying de facto status[.]" (*In re Vincent C., supra,* 53 Cal.App.4th at p. 1358.)

Considering all the circumstances of this case, the juvenile court did not abuse its discretion in granting Arthur's motion for de facto parent status.

## DISPOSITION

The order is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.

*In re Ella S.* (A143338)

15