Filed 12/23/25  In re Y.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Y.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br>v.<br>P.R.,<br><br>        Defendant and Appellant. | A173592<br><br>(San Mateo County Super. Ct. Nos. 23JD0392, 23JD0393) |

P.R. (mother) appeals a juvenile court order granting de facto parent status to the caregivers of her two sons, Y.P. and A.P.  Mother's sole argument is that the order must be reversed because the juvenile court was required, but failed, to conduct an evidentiary hearing before ruling on the caregivers' request for de facto parent status.  We affirm.

## BACKGROUND

On September 28, 2023, the San Mateo County Human Resources Agency (Agency) filed petitions on behalf of A.P. (then only eight days old) and Y.P. (then one year old) under Welfare and Institutions Code section

1

300.[1]  As later amended, the petitions alleged that mother neglected to address A.P.'s basic and special needs shortly after he was born.  A.P. was diagnosed with jaundice, but mother accused hospital staff of lying about the diagnosis and trying to take A.P. away from her; ignored medical advice regarding his care; was inattentive to him; and tried to leave the hospital with him before discharge and against medical advice.  The petitions alleged that mother's neglect of A.P. placed him at substantial risk of harm (§ 300, subd. (b)(1)), and placed Y.P. at substantial risk of neglect as well (§ 300, subd. (j)).  The petitions also alleged mother failed to protect Y.P. (§ 300, subd. (b)(1)) during a prior incident, when his older half-sibling hit and possibly seriously injured Y.P., but mother did not take Y.P. to the doctor for fear of being suspected of hurting Y.P.

Days after A.P.'s birth, he and Y.P. were detained and placed in foster care.  In January 2024, they were placed with their current foster family (hereafter, caregivers or foster parents).

On March 11, the juvenile court sustained the amended petitions, declared the minors dependents, removed them from mother's custody, and ordered that mother receive reunification services.

In its six-month review report, the Agency noted mother was psychologically evaluated and diagnosed with several psychological disorders.  She had a "significant persecutory and paranoid" and "highly tangential and circumstantial" thought process, and engaged in hyperverbal speech.  She was distrustful of the Agency and service providers.  However, she recently became more receptive to discussing her case plan.  Mother started attending individual therapy and parenting classes.  She struggled with finding

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

2

housing and was living in a shelter.

Mother attended supervised visits with the children once per week for two hours. The first hour consisted of therapeutic visitation, a type of visitation supervised by a mental health clinician designed to decrease safety concerns, increase positive interactions, and support mother in understanding the children's cues. The second hour was supervised by a family care worker of the Agency. Mother was positive and affectionate with the children. But the visitation supervisors had concerns about mother's ability to identify safety issues and her responsiveness with the children. For example, mother would "present with a flat affect, ignore the children and turn her back to them. Sometimes she is open to suggestions and other times she is not."

The social worker reported that the children were in overall good health and formed a trusting relationship with the caregivers. A.P. was "active" and "happy," and showed affection to the caregivers. Y.P. was eager to engage with his caregivers. The caregivers, however, reported that Y.P. sometimes experienced emotional dysregulation. He was "sweet and kind and nice" when he was in a calm state, but would transition "quickly to anguish" and "despair." He also had nightmares.

The Agency recommended continuing reunification services for mother. At the six-month review hearing on August 29, the court adopted the Agency's recommendation.

In its 12-month review report filed on November 8, the Agency noted that the children were doing well overall under the caregivers' care. Y.P. in particular started attending, and made progress in, speech and early intervention therapy.

The Agency did not believe mother had made substantial progress to

3

warrant continuing reunification services to the 18-month review hearing. It noted among other things that the visitation supervisors recommended decreasing mother's visits due to ongoing concerns that she was unable to read the children's cues, was inattentive and often "stared off," and was not always responsive to the feedback and redirection offered to keep the children safe. The Agency further believed that mother continued to lack insight as to why the children were removed from her care, did not understand the relevance of services, and blamed others for her actions. The Agency thus recommended that the court terminate reunification services and set a permanency planning hearing under section 366.26.

Due to continuances of the 12-month review hearing, the case passed the 12-month mark and reached the 18-month mark as of March 26, 2025.

In an addendum report for the 12-/18-month review hearing, the Agency wrote that the children were thriving in the caregivers' home. The children were progressing in their social skills; were active, social, and comfortable in their placement; and appeared clean and well cared for. The caregivers were attentive, committed, and protective in addressing the children's needs. The children were observed to be affectionate with the caregivers, greeting them with hugs and kisses.

Mother failed to alleviate safety concerns during visits. Because mother remained unreceptive to guidance from the visitation clinician, the clinician opined that mother no longer benefited from therapeutic visitation. As a result, those services were terminated. The Agency continued to recommend terminating reunification services.

On May 27, the caregivers requested to be declared de facto parents. The next day, mother filed a written objection to the request. Her counsel alleged she had heard the caregivers "inappropriately exaggerate alleged

issues with the child(ren) after visits [with mother] for purposes of preventing planned reunification, such as stating that the child looks 'in despair' and exaggerating a wet diaper upon return or sweet food items provided by mother, despite every supervised visitation log indicating that mother's food provision is appropriate, that mother changes diapers regularly, and mother is appropriate with the children during visits." The court set a hearing on the caregivers' request for de facto parent status for June 17.

Meanwhile, on June 10 the caregivers filed a "Caregiver Information Form" setting forth their reports on the children who recently began overnight visits with mother. The children were hungry and tired after some of the visits. Y.P. became more emotionally volatile and clingy, and his nightmares became more severe after visits. However, the caregivers reported that both Y.P. and A.P. mostly maintained the overall growth they had achieved over the past 14 months.

In another addendum report for the 12-/18-month review hearing, the Agency noted that during a child and family team (CFT) meeting on April 16, a plan for transitioning mother's visits to unsupervised was discussed. The Agency submitted a referral for mother to move to a family shelter, as she was living in an adults-only shelter with an exit date of May 13. But the family shelter required that mother have at least 50% custody over the children in order to stay there. The family shelter advised it would accept mother when she was ready for overnight visits with the children. Given these circumstances, the limited time left "allotted for reunification," and the fact that mother was "working more effectively with providers," the Agency agreed to give mother an opportunity for unsupervised, overnight visits.[2]

---

[2] This was so, even though mother wanted to keep the current visitation schedule so she could focus on finding employment.

Those visits began on May 17.

During a CFT meeting on May 21, the caregivers' concerns about the children after visits with mother were discussed. Despite those and other concerns, the Agency agreed to continue with mother's overnight visitation plan.

On May 29, the family shelter reported "serious safety concerns . . . about mother's supervision of the children." Specifically: "mother left sleeping children unattended for 20 minutes while getting food, with [Y.P.] sleeping on a bed without rails; children were found playing unsupervised behind laundromat equipment; and most critically, two workers found the children outside unsupervised while mother was showering." The shelter "emphasized the severe safety risk given the shelter's proximity to the Cal Train tracks, which children could easily access, stating that mother's inability to properly supervise and care for the minors, and limited functioning put the children's lives at risk due to poor supervision." "Additional incidents included children hiding behind a dumpster while mother was unaware of their whereabouts, and mother allowing children to run outside unsupervised while she looked at donations for more than 5 minutes . . . ." The shelter staff reported subsequent incidents during which mother left the children unsupervised. Mother, however, denied doing so.

At the end of its report, the Agency credited mother for her participation and engagement in mental health services, including family and individual therapy, and in showing positive behaviors during some of her visits with children. However, the Agency's "biggest concern" was mother's "inability to supervise her children," as evidenced by the numerous incidents reported by the shelter. It added that it had "serious concerns about the mother's mental health, protective capacity, and her[ ] ability to ensure that

6

the children's emotional and developmental needs are met without supervision and external reminders. Given the children's bery [*sic*] young age . . . , the mother's lack of adequate supervision could be deadly." Accordingly, the Agency reiterated its recommendation to terminate reunification services.

At the June 17 hearing on the caregivers' request for de facto parent status, the court appointed counsel for the caregivers. Mother's counsel then requested an evidentiary hearing. Counsel for the minors, the caregivers, and the Agency all agreed that the caregivers met the definition of de facto parents under California Rules of Court, rule 5.502(10). The Agency held "no position regarding the request for an evidentiary hearing."

The court asked mother's counsel, "What kind of evidence do you anticipate presenting at a contested hearing?" Counsel replied, "I would cross-examine the social worker . . . regarding the de facto parents and basically what I believe is harm that they've caused to the children . . . ." Counsel alleged that the "harm" had "to do with the [caregivers'] interference with the parent/child relationship, attempting to prevent reunification, saying negative things about the children and the mother . . . ." The court then asked counsel what "good-faith basis" she had "for believing that there is such evidence in this case," adding that it did not "want to set the matter for a contested hearing and waste resources unless [it] th[ought] that there [was] something meaningful that would be probative that would come out of it."

In response, mother's counsel stated that "at the last day of team meeting, [she] heard the foster father say . . . [,] in a very emotional tone[,] 'Mother is three times slower than the average parent at remembering things and learning things.'" The court replied, "[T]hat statement alone doesn't

7

really cause concern in the Court's mind. [¶] I think in terms of ability to remember, or retain, or learn information, I think there has been other sources as to that . . . [T]hat statement is something that has been documented and addressed, you know, in various reports. So it is not something that is manufactured to prevent a reunification process," even accepting that "it was stated in an angry, hostile tone."

Mother's counsel then asserted that the foster father also asked, " 'How can we proceed to increase visitation when mother is so bad' " and " '[t]he way the children after visits is so bad.' "

Counsel for the minors disagreed with mother's counsel's characterization of the caregivers, and pointed out that at the end of the referenced CFT meeting, "visitation was liberalized and there were multiple overnights." The court interjected, stating, "And I would note there is nothing in the reports . . . in terms of anything that was noted as the foster parents having done to harm the children."

Mother's counsel stated: "I'm not alleging abuse by them of the children. . . . But . . . I am alleging that they have influenced the agency's investigation negatively through information that I don't believe is accurate. . . . So I believe that harmed the children because it's in the best interest of children to return home to their parents if–as long as it's safe."

The Agency's counsel argued: "whether or not [mother's counsel's] statements are true regarding the respective de facto parents, nothing they have said has altered the agency's perspective about reunification. [¶] . . . The original recommendation for this case was reunification and there was an extension of visits with overnights. [¶] And the reason the agency . . . [has] moved towards the recommendation of termination of services is because we had this period where the children were with mother

8

on unsupervised time and there were grave safety concerns that were reported by the shelter staff . . . as outlined in the social worker's report. So even if we were going to agree, nothing . . . the foster parents have said or done has changed the way the agency has worked throughout this case."

Following further argument, the court announced its ruling: "The court is satisfied that there is substantial evidence that the applicants for de facto parent status . . . qualify as defined under California Rules the Court 5.502, Section 10. The Court finds that they have assumed on day-to-day basis the role of a parent fulfilling the child's physical and psychological needs for care and affection and have assumed that role for a substantial period of time. [¶] I do note that most recently that they have filed a caregiver report as it relates to both children, which again, just demonstrates the kind and quality of information that they are providing to the Court and why it is beneficial to have that kind of information when the Court is trying to make a decision as to what is in their best interest. [¶] The Court denies the request to set this matter for a contested hearing." In a minute order for the hearing, the court granted de facto parent status to the caregivers.[3]

## DISCUSSION

Mother contends the juvenile court violated her due process rights when it granted the caregivers' request for de facto parent status without first affording mother an evidentiary hearing as she requested.[4] We disagree.

**General Legal Principles**

"The de facto parent doctrine is an 'important rule of procedure' which 'recognizes that persons who have provided a child with daily parental

---

[3]     The court set the contested 12-/18-month review hearing for several dates in August and September.

[4]     The Agency filed a document stating that it would not be filing a respondent's brief and takes no position in response to mother's opening

9

concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding.' " (*In re A.F.* (2014) 227 Cal.App.4th 692, 699, quoting *In re Kieshia E.* (1993) 6 Cal.4th 68, 70–71, 77.) Rule 5.502(10) of the California Rules of Court defines a "de facto parent" as "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." A person seeking de facto parent status has the burden of proving by a preponderance of the evidence that he or she meets the definition. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 602.)

"Whether a person falls within the definition of a 'de facto parent' depends strongly on the particular individual seeking such status and the unique circumstances of the case." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66.) Relevant factors courts consider in determining whether to grant a de facto parent request include whether: the child is psychologically bonded to the adult; the adult has assumed the role of a parent on a day-to-day basis for a substantial period; the adult possesses information about the child that other participants do not possess; the adult has regularly attended juvenile court hearings; and a future proceeding may result in an order permanently foreclosing any future contact with the adult. (*Id.* at pp. 66–67.)

---

brief. Where no respondent's brief has been filed, we may decide the appeal on the record and the opening brief (Cal. Rules of Court, rule 8.220(a)(2).) Mother "still bears the 'affirmative burden to show error whether or not the respondent's brief has been filed,' and we 'examine the record and reverse only if prejudicial error is found.' " (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078.)

"The key reason for affording de facto parents standing to appear and participate is so they may provide critical information that assists the court in determining what disposition is best for the child." (*In re A.F.*, *supra*, 227 Cal.App.4th at p. 701.) Accordingly, de facto parents have certain procedural rights, including the right to be present at a hearing; the right to be represented by retained counsel, and in the discretion of the court, appointed counsel; and the right to present evidence, the extent of which depends upon the relevant circumstances. (*Id.* at p. 700; Cal. Rules of Court, rule 5.534(a).)

But while de facto parents have "standing to participate as [parties]" (Cal. Rules of Court, rule 5.534(a)), they "are not part of any adversarial aspect of a dependency case." (*In re B.F.* (2010) 190 Cal.App.4th 811, 817.) "[T]heir role is limited and they do not enjoy the same due process rights as parents." (*Ibid*.) Moreover, de facto parents do not have the same substantive rights and preferences as parents or even legal guardians. (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371.) "Specifically, they do not have the right to reunification services, custody, or visitation." (*Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 752.) De facto parent "status merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court." (*In re Bryan D.* (2011) 199 Cal.App.4th 127, 146.)

"Recognizing that a court can only benefit from having all relevant information on the best interests of the child, appellate courts also have observed that de facto parent status ordinarily should be liberally granted." (*In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.) "[A] juvenile court should not deny a request for de facto status based upon some vague concern that such participation will . . . somehow interfere with the goal of providing the child with a stable and loving home. To the contrary, where [the applicant]

11

has cared for a dependent child for an extended period of time and has never done anything to cause substantial or serious harm of any kind to that child, there ought to be a very good reason for denying de facto status . . . ." (*In re Vincent C.* (1997) 53 Cal.App.4th 1347, 1358.)

### The Juvenile Court Did Not Err in Declining to Hold an Evidentiary Hearing on the Request for De Facto Parent Status

As an initial matter, we question whether mother has standing to challenge the order granting the caregivers de facto parent status.

"[A] parent cannot raise issues on appeal from a dependency matter that do not affect her own rights." (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703.) Applying this principle, several cases have held that a parent in a dependency appeal cannot challenge a court's de facto parent ruling. For example, in *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, a court held a father lacked standing to challenge the court's decision to deny de facto parent status to his mother and sisters. The court stated: "Here, [father's] interest in the dependency proceeding is to reunify with his dependent child. A de facto parent's nexus with the proceeding is that person's separate interest and relationship with the child, which may have developed over time through the daily care, affection and concern for the child. [Citation.] The de facto parent's interest is not, as [father] suggests, in acting as an advocate to preserve the natural parent's bond with the child. The fact his relatives have not been accorded de facto parent status does not preclude [father] from presenting any evidence about [the minor's] best interests or his relationship with her. Because [father] is not aggrieved by the order, he may not challenge it on appeal." (*Id.* at p. 261.) Other courts have reached the same conclusion in appeals brought by parents challenging a de facto parent status ruling. (See *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1836; *In re Crystal J.* (2001) 92 Cal.App.4th 186, 189.)

We note, however, that these cases involved the *denial* of a request for de facto parent status, arguably making them distinguishable from the present case. But assuming without deciding mother has standing to challenge the de facto status ruling, we would reject her claim on the merits.

Mother argues the "denial of [her] request for a contested hearing on the issue of de facto parent status violated her right to due process." This claim presents an issue of law that we review de novo. (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434.)

Mother relies primarily on cases that have held a parent has an "unfettered" right to a contested review hearing during the reunification phase. For example, *In re James Q.* (2000) 81 Cal.App.4th 255 (*James Q.*), a case mother cites, held that a court may not deny a parent the right to a contested review hearing based on an allegedly inadequate offer of proof. (*James Q., supra*, 81 Cal.App.4th at p. 258.) The review hearing at issue there was a six-month review hearing pursuant to section 366.21, subdivision (e) to decide whether the appellant parent should receive an extended period of reunification services. (*James Q.*, at pp. 258–259.) In holding the parent's right to obtain a contested evidentiary hearing at that stage was absolute, the court emphasized the action taken at such a hearing could lead to a permanent severance of the parent-child relationship, and it was the agency's burden at that stage to prove the minor should not be returned to parental custody or services should be ended. (*Id.* at pp. 260–261.) Moreover, the statute itself expressly provided for a "hearing" to be held. (*James Q.*, at p. 261.) The court found review hearings during the reunification phase were also critical because they were the parent's "best opportunity . . . to make the strongest case possible" for returning the child to parental custody and the decisions made at them could not be relitigated at the termination hearing.

13

(*Id.* at pp. 262–263.) *James Q.* distinguished other cases holding that dependency courts may properly require an offer of proof before granting contested hearings in proceedings following the expiration of the reunification period. (*Id.* at p. 267; see *David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 779–780 (*David B.*) [following *James Q.*, holding court could not require father to tender offer of proof to obtain contested 18-month review hearing].) *James Q.* further held that the contested review hearing includes "the right to present evidence, cross-examine adverse witnesses, and to argue the law and the facts." (*James Q.*, at p. 268.)

After citing the above cases, mother "contends it was a violation of her due process rights to deny her request for an evidentiary hearing on the issue of the foster parents [*sic*] request for de facto parent status." In so arguing, she suggests she had an absolute right to an evidentiary hearing, unconditioned on an adequate offer of proof. We are unpersuaded.

Mother's reliance on *James Q.*, *David B.*, and similar cases is misplaced. For one, those cases addressed the procedures applicable at a review hearing, and not the particular setting here. Indeed, *David B.* expressly declined to "address whether [its] analysis as applied to review hearings during the reunification period pertains to other provisions of the dependency scheme." (*David B.*, *supra*, 140 Cal.App.4th at p. 780.)

Further, unlike in *James Q.* and cases that follow it, mother was not facing termination of her parental rights. The issue before the juvenile court in this case was far more limited. As noted above, and contrary to mother's contentions otherwise, recognizing the caregivers as de facto parents does not imply any diminution of mother's role. De facto parents have no role in "any adversarial aspect of a dependency case." (*In re B.F.*, *supra*, 190 Cal.App.4th at p. 817.) Their "nexus with the proceeding" is a "separate interest and

14

relationship with the child," apart from the parent's efforts to reunify with the child. (*In re Vanessa Z.*, *supra*, 23 Cal.App.4th at p. 261.) Further, "[g]ranting de facto parent status does not mean the child will be placed with the de facto parents. The status merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court." (*In re Bryan D.*, *supra*, 199 Cal.App.4th at p. 146.) In fact, de facto parents do not even have an automatic right to receive Agency reports and other documents filed with the court. (*In re B.F.*, at pp. 817–818.) Thus, the parental interest at stake in a proceeding to determine whether a person is entitled to de facto parent status is comparatively less consequential than that at a review hearing. For these same reasons, the hearing on the request for de facto parent status also was not mother's "best opportunity . . . to make the strongest case possible" for reunification services. (*James Q.*, *supra*, 81 Cal.App.4th at p. 263.)

As such, mother fails to establish she had an "unfettered" right to an evidentiary hearing on the caregivers' request for de facto parent status. And since mother makes no alternative argument that the court abused its discretion in impliedly finding her offer of proof insufficient to warrant an evidentiary hearing, we may affirm the order granting de facto parent request. (See *In re A.B.*, *supra*, 230 Cal.App.4th at pp. 1439–1440.)

But even assuming the court erred in denying mother's request for an evidentiary hearing, any such error was harmless under any standard of prejudice.

The court found, and mother does not dispute, that there was substantial evidence that the caregivers qualified as de facto parents as defined in rule 5.502(10) of the California Rules of Court. Mother also appears to concede that the factors identified in case law as bearing on de

15

facto parent status whether a person qualifies as a de facto parent (see *In re Patricia L.*, *supra*, 9 Cal.App.4th at pp. 66–67) were met here.

That said, a person who otherwise qualifies as a de facto parent may be denied that status if he or she has "betrayed and abandoned, not embraced," the role of parent by inflicting harm on the child or by exposing the child to a risk of serious harm. (*In re Kieshia E.*, *supra*, 6 Cal.4th at p. 78.) Stated another way, when a nonparent caretaker commits "a *substantial harm*," i.e., a harm which is "fundamentally at odds with the role of a parent," that person has no right to de facto parent status. (*In re Vincent C.*, *supra*, 53 Cal.App.4th at pp. 1356–1357; see, e.g., *In re Kieshia E.*, at pp. 79–80 ["a nonparent who commits sexual or other serious physical abuse upon a child in his or her charge thereby abandons the function of care, affection, and psychological fulfillment essential to the role of a de facto parent."].) Conversely, if the caretaker has not committed any substantial harm, and if the relevant factors supporting de facto parent status are present, the de facto parent application should be liberally granted. (*In re Vincent C.,* at p. 1358.) In other words, a "court should not deny a request for de facto status based upon some vague concern that such participation will . . . somehow interfere with the goal of providing the child with a stable and loving home." (*Ibid.*)

As noted, mother's counsel represented that at an evidentiary hearing she would cross-examine the social worker regarding statements made by the caregivers criticizing mother or her caretaking. Counsel's offer of proof focused on the foster father's statements during a recent CFT meeting that mother could not quickly retain or learn information and that " '[t]he way the children are after visits [with mother] is so bad.' " Mother's counsel argued that cross-examining the social worker regarding these statements would

16

show the caregivers' intent to negatively influence the Agency's investigation and interfere with reunification, which in turn showed they harmed the children.

Even assuming that mother's counsel's representations about the caregivers' statements were true, and that such representations could have been substantiated at an evidentiary hearing, we cannot conclude that mother would have obtained a more favorable ruling.

In rejecting mother's offer of proof, the court apparently found that the proffered evidence was cumulative to evidence already produced in the record. For example, with respect to the foster father's statements regarding mother's ability to retain information, the court noted that observation about mother was "documented and addressed" by other sources "in various reports." Mother did not dispute the court's characterization of the record. Likewise, regarding the caregivers' statements that the children exhibited negative behaviors after visits with mother, the Agency's reports note that other individuals made similar observations on their own. For example, the social worker noted in the second addendum report that she "typically [saw] the boys when they returned home from their visits with the mother," and observed that Y.P. was "clingy to foster mom," that Y.P. "crie[d] with desperation and anguish when attention is not given to him immediately," and that both children were "typically hungry and c[a]me demanding food."[5]

---

[5] Similarly, other statements of the caregivers that mother identified in her written objection to the request for de facto parent status—that the children had wet diapers upon return from visits and that mother gave them sugary foods—were consistent with reports from other individuals documented in the Agency's reports. The therapeutic visitation clinician reported that mother gave the children sugary foods. In fact, mother apparently admitted doing so. The social worker discussed with her the caregivers' concerns about the children experiencing a "sugar crash after

Having the social worker or caregivers testify about the latter's statements could (and apparently did) appear to the court as cumulative to evidence that was supplied by other sources and already documented in the Agency's reports. "Such a decision would be well within the court's discretionary power to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time . . . .' (Evid. Code, § 352.)" (*In re Damion B.* (2011) 202 Cal.App.4th 880, 890.)

In addition, we infer from the court's comments that it viewed mother's proffered evidence as lacking in probative value, in that the caregivers' purported statements could not support the inferences mother sought to draw from them—i.e., that the caregivers attempted to negatively influence the Agency's investigation and thwart reunification. For example, as noted, the court found that because some of the statements of the caregivers were substantiated by other sources, it rejected the notion that the statements were "manufactured to prevent a reunification process." In addition, as minors' counsel pointed out, even after the foster father made his statements about mother during the recent CFT meeting, the Agency nonetheless agreed to *continue* mother's overnight visitation plan. Moreover, as the Agency's counsel explained, its recommendation to terminate reunification services at that time was, as stated in its second addendum report, based primarily on

visits," to which "mother expressed understanding." Regarding the children's diaper issues, during a visit in May 2025 the social worker saw that Y.P. appeared to have a soiled diaper and twice prompted the mother to address it, but mother ignored those prompts. It was not until Y.P. placed his hand inside his diaper and his hand became dirty with feces that mother changed his diaper. During another visit, a family care worker reported that "mother said she had difficulty with changing diapers since no one was there to help her take the children to the bathroom."

18

the "grave safety concerns that were reported by the shelter staff" regarding mother's lack of supervision of the children. Put differently, because the Agency did not base its recommendation to terminate reunification services on the caregivers' reports, "nothing they have said ha[d] altered the agency's perspective about reunification."

The record thus supports that even if the court had held an evidentiary hearing, it is very likely it would have found that the inferences mother sought to draw from her proffered evidence were speculative and, therefore, irrelevant. " 'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 681–682.) In other words, " 'evidence which produces only *speculative* inferences is *irrelevant* evidence.' " (*Id.* at p. 682; accord, *People v. Kraft* (2000) 23 Cal.4th 978, 1035 ["evidence leading only to speculative inferences is irrelevant"].) Further, "the court . . . has no discretion to admit irrelevant evidence." (*People v. Babbitt, supra*, 45 Cal.3d at p. 682.) In short, that the court would have accorded much weight to mother's proffered evidence at an evidentiary hearing seems very unlikely.

Consequently, it is very unlikely that the court would have denied the request for de facto status even if it had allowed mother to cross-examine witnesses regarding the caregivers' statements. Such evidence would have demonstrated at most a "vague concern" that allowing the caregivers to participate in the proceedings would "somehow interfere with the goal of providing the child with a stable and loving home." (*In re Vincent C., supra*, 53 Cal.App.4th at p. 1358.) But as noted, such a "vague concern" is not a reasonable basis to deny de facto parent status. (*Ibid.*) Moreover, there was

19

no allegation that the caregivers abused or posed a danger to the children. To the contrary, the evidence indisputably shows that the caregivers' care of the children was by all accounts excellent.

Considering the totality of the circumstances, and the recognition that de facto parent status is liberally granted, we cannot conclude, using any standard for prejudice, that the denial of mother's request for an evidentiary hearing on the caregivers' request for de facto parent status requires reversal.

## DISPOSITION

The order granting de facto parent status to the caregivers is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A173592N)

21